Eduardo P. PANGILINAN, et al.,
Plaintiffs-Appellees,

v.

Francisco C. CASTRO, et al.,
Defendants-Appellants.

No. 80–4588.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 20, 1982.

Decided Sept. 20, 1982.

James S. Sirok, Asst. Atty. Gen., Saipan, Mariana Islands, Joe Ciolino, Washington, D.C., for defendants-appellants.

Michael A. White, Saipan, Mariana Islands, for plaintiffs-appellees.

Before SCHROEDER, NELSON and BOOCHEVER, Circuit Judges.

SCHROEDER, Circuit Judge.

This case requires us to examine the evolution of the Commonwealth of the Northern Mariana Islands. We must determine whether appellees, eighty-five individuals who renounced their Filipino citizenship in 1977 in order to be eligible to secure rights as citizens of the emerging commonwealth, and who were found qualified to vote in the election of commonwealth officials, may be denied certificates of identity as citizens of the commonwealth after its government began operation. The district court, after a thorough and scholarly review of the relevant history, held that the new government could not challenge plaintiffs' qualifications for interim citizenship. We affirm.

The relevant history begins with the Covenant to Establish a Commonwealth of Northern Mariana Islands in Political Union with the United States of America.[1] The Covenant was approved by Congress on March 24, 1976. Pub. L. No. 94–241, 90 Stat. 263 (1976), *reprinted in* 48 U.S.C. § 1681 note, at 237 (Supp.1982). The people of the Northern Mariana Islands also approved the Covenant by plebiscite. The Covenant governs the relationship between the Northern Marianas and the United States during the transitional period during which the Northern Marianas evolve from a Trust Territory to an independent commonwealth. Article III, § 301 of the Covenant

1. For a more detailed recital of facts, see *Smith v. Pangilinan*, 651 F.2d 1320, 1321–23 & nn. 1–5 (9th Cir. 1981). *See generally* Willens & Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting*, 65 Geo. L.J. 1373 (1977).

provides that citizens of the Trust Territory, and noncitizens meeting certain domicile requirements, will become United States citizens upon termination of trusteeship status.[2]

Pursuant to article II, § 201 of the Covenant, the people of the Northern Marianas formulated a constitution. The constitution was ratified by popular vote on March 6, 1977. Pursuant to a presidential proclamation issued October 24, 1977, the constitution became effective on January 9, 1978.[3]

Section 8 of the Schedule of Transitional Matters of the constitution contains an "Interim Definition of Citizenship" that is identical to the provisions of article III, § 301 of the Covenant.[4] Thus, by operation of § 8(c), those residents of the Northern Marianas who (a) did not owe allegiance to any foreign state on March 6, 1977, the date the constitution was ratified; and (b) were domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974, until March 6, 1977, were entitled to

the benefits of the interim status of United States citizenship. It is this "interim" citizenship that is at the heart of the present dispute.

In September 1977, the Resident Commissioner[5] signed into law the Election Act of 1977, which had been passed by the territorial legislature. The Act authorized creation of a Board of Elections to oversee the general election of December 10, 1977, which was to fill the elective offices provided for in the constitution. Section 6 of the Election Act set forth the standards for eligibility to vote:

a) A person is eligible to vote, who on the date of election is eighteen (18) years of age, is domiciled in the Northern Marianas, has resided in the Northern Marianas for at least forty-five (45) days prior to election day, is not serving a sentence for a felony, has not been declared by a court to be judicially insane, and is either a citizen or national of the

---

2. Art. III, § 301 of the Covenant provides:

The following persons and their children under the age of 18 years on the effective date of this Section, who are not citizens or nationals of the United States under any other provision of law, and who on that date do not owe allegiance to any foreign state, are declared to be citizens of the United States, except as otherwise provided in Section 302:

(a) all persons born in the Northern Mariana Islands who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, and who on that date are domiciled in the Northern Mariana Islands or in the United States or any territory or possession thereof;

(b) all persons who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, who have been domiciled continuously in the Northern Mariana Islands for at least five years immediately prior to that date, and who, unless under age, registered to vote in elections for the Marianas Islands District Legislature or for any municipal election in the Northern Mariana Islands prior to January 1, 1975; and

(c) all persons domiciled in the Northern Mariana Islands on the day preceding the effective date of this Section, who, although not citizens of the Trust Territory of the Pacific Islands, on that date have been domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974.

Pub. L. 94–241, 90 Stat. 263 (1976), *reprinted in* 48 U.S.C. § 1681 note, at 239 (Supp.1982). Section 301 becomes effective, under art. X, § 1003(c) of the Covenant, upon the termination of the trusteeship agreement with the United States. *See* 90 Stat. at 277, *reprinted in* 48 U.S.C. § 1681 note, at 245 (Supp.1982). The trusteeship agreement was originally scheduled to terminate in 1981, but has been extended.

3. Presidential proclamation No. 4534, 42 Fed. Reg. 56593 (1977), *reprinted in* 48 U.S.C. § 1681 note, at 245 (Supp.1982).

4. Section 8 of the Schedule on Transitional Matters provides in relevant part that

the term United States citizen ... as used in the Constitution includes those persons who, on the date of the approval of the Constitution by the people of the Northern Mariana Islands, do not owe allegiance to any foreign state and who qualify [as]: (c) ... persons domiciled in the Northern Mariana Islands on the date of the approval of the Constitution ... who, although not citizens of the Trust Territory of the Pacific Islands, on that date have been domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974.

5. The Trust Territory was committed to the governance of the Secretary of the Interior who in turn delegated administrative functions to the Resident Commissioner.

United States *as defined in the Constitution.*

b) Domicile means that place where a person maintains a residence with the intention of continuing that residence for an indefinite period and to which that person has the intention of returning whenever absent, even for an extended period.

(emphasis added). Subsections (c) and (d) set forth the relevant standards and criteria for determining domicile. The Election Act thus incorporated the standards for determination of entitlement to interim citizenship status set forth in the constitution and the Covenant.

Other sections of the Election Act delineated procedures to be followed by the Board in determining the eligibility of registrants, including provisions for investigations and findings to determine eligibility. The Board constituted under the Act held its first meeting on September 22, 1977, and set about the business of registering eligible voters.

Appellees, having formally renounced "allegiance to any foreign state" prior to ratification of the constitution, sought to become registered voters. The Board investigated their applications in order to determine whether the dual requirements of prior renunciation of foreign citizenship, and continuous domicile since January 1, 1974, were met. Some eighty-five such applicants were interviewed and examined at a meeting of the Board, and all were found eligible to vote.

Following the election, the new commonwealth government took office on January 9, 1978, the effective date of the constitution. Pursuant to § 2 of the constitutional transition schedule, territorial laws in effect the preceding day remained in effect and binding until repealed or amended.[6]

In July of that year the commonwealth legislature enacted the Certificate of Identity Act, the stated purpose of which was to identify those entitled to the benefits of interim citizenship status under § 8 of the constitution and article III, § 301 of the Covenant. Section 3(c) of the Certificate of Identity Act set forth requirements for such status that are substantially identical to those embodied in the Covenant, the constitution, and the Election Act.

The Certificate of Identity Act also set forth procedures to be used by the Chief of Immigration in determining entitlement to a certificate of identity. An applicant was required to submit an application to the Department of Immigration on a form provided by the Department. The application was required to "be supported by evidence, documentary and otherwise, sufficient to establish entitlement to the Certificate of Identity . . . . "

The named plaintiffs in this case applied for certificates of identity, and offered in support of their applications proof of voter registration. Hearings were held and each was denied a certificate. They then filed this class action to compel the Chief of Immigration to issue certificates to all members of the class. The class certified by the district court included all those who (a) had formally renounced allegiance to any foreign state prior to March 6, 1977, and (b) who had been found eligible to vote by the Board of Elections. The district court held that, first, the Northern Mariana Islands (NMI) Department of Immigration was barred by the doctrine of administrative res judicata from relitigating the issue of domicile, and second, that the Department of Immigration was equitably estopped to conduct an independent inquiry into the qualifications of the applicants by virtue of the prior determination by the Board of Elections. We hold that in the unusual circumstances presented here the NMI Department of Immigration is bound by the election board's prior determination that plaintiffs met the constitutional requirements for citizenship. We affirm on

---

**6.** N.M.I. Const., Schedule on Transitional Matters § 2 provides that "[l]aws in force in the Northern Mariana Islands on the day preceding the effective date of the Constitution that are consistent with the Constitution and the Covenant shall continue in force until they expire or are amended or repealed."

this basis and do not reach the issue of equitable estoppel.

Appellants do not contend that plaintiffs were guilty of any fraud or misrepresentation in connection with their voter registration, or that plaintiffs are for any reason undesirable. Nor do appellants challenge the major factual predicate of the district court's estoppel holding, *i.e.,* that in allowing plaintiffs' renunciation of citizenship to become a matter of public record for purposes of voter registration, as well as in their continued planning of their lives in the Northern Marianas, plaintiffs believed that they had met the constitutional requirements for citizenship.

Appellants' principal contention is that the new government is not bound by the election board's determination because the Board, in registering voters, was a different agency performing a different function than was the new Department of Immigration when it began identifying persons qualified for citizenship. In our view this argument ignores the unique historical context of this case. The Board was to supervise the first election to establish a new government. The government was to be elected by a citizenry that had been described but not yet identified. It therefore was the function of the election board to identify those persons qualified for citizenship; it was performing the same task later performed by the Department of Immigration under the same constitutional standards. For purposes of identifying citizens, the Department of Immigration was the successor agency to the election board.

The situation in this case must be distinguished from those involving one agency's consideration of an issue which has already been determined by another agency with different substantive jurisdiction. *See, e.g., FTC v. Texaco, Inc.,* 555 F.2d 862 (D.C.Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), cited by appellants. In this case both agencies were applying the same constitutional criteria for citizenship. We are familiar with only one case involving conflicting agency decisions with respect to the specific issue of citizenship. *Cartier v. Secretary of State,* 356 F.Supp. 460 (D.D.C.1973), *remanded,* 506 F.2d 191 (D.C.Cir.1974), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). *Cartier* involved inconsistent citizenship rulings by the Department of State and the Attorney General. The district court held that the Attorney General was bound by the State Department's prior determination. That decision supports the district court's decision here. The court of appeals reversed on procedural grounds, but Judge McGowan's opinion commented on the need for flexibility in the application of the doctrine of administrative res judicata:

> The question of the applicability of the doctrine of administrative *res judicata* to determinations made pursuant to the Immigration and Nationality Act is likewise a complex and difficult question. While the doctrine of administrative *res judicata* has in recent years found increasing acceptance in some areas of administrative law, it has not evolved into a rigid system that is to be blindly applied in every context. As Professor Davis recently observed, "[t]he sound view is ... to use the doctrine of res judicata when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor." K. Davis, Administrative Law Text, § 18.02, at 360 (1972)....
>
> The Immigration and Nationality Act is silent on the question of the kind of impact that a State Department determination of this kind should have on other federal agencies charged with administration of the Act....
>
> It is apparent from the bifurcation of responsibilities that each agency will be called upon to address similar issues in different contexts.

*Cartier, supra,* 506 F.2d at 196–97 (footnote omitted).

In this case, there is no such bifurcation of responsibility between agencies contem-

poraneously addressing similar issues but in different contexts. Accordingly, we need not decide whether all determinations of the election board are binding on all agencies of the successor government for all purposes. We are mindful of the contrast between the informal administrative procedures followed by the election board, and the quasi-judicial proceedings of a dispute-settling agency which underlay the administrative res judicata ruling in *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (The Atomic Energy Commission's Advisory Board of Contract Appeals). Administrative res judicata is a flexible and equitable doctrine. Accordingly, we hold only that, since the responsibility granted the Department of Immigration in the new government was, in these unique circumstances of governmental transition, the same responsibility imposed on the election board in determining whether these plaintiffs were citizens, the new agency is bound by that determination and will not be permitted to undertake a new administrative inquiry.[7]

The remaining question in the case involves the interest of the United States. The United States has been permitted to intervene because in the last phase of the transition to commonwealth status, when the trusteeship is abolished, the Covenant by its terms contemplates full United States citizenship for interim citizens. In an earlier appeal in this case, we held that the United States has a right to represent its own interests in this litigation. *See Smith v. Pangilinan,* 651 F.2d 1320 (9th Cir. 1981). However, despite the pendency of that appeal, proceedings in the district court were not stayed. The United States therefore was not a party to the proceedings which led to the decision we review today. That decision does not purport to affect interests of the United States with respect to permanent United States citizenship, and since the district court has not yet considered those interests, the case must be remanded to permit such consideration if the United States desires it. In that event, any defenses may be considered. The case must be remanded, in any event, for the court's consideration of plaintiffs' damage claims and application for attorneys' fees.[8]

Affirmed and remanded.

---

7. This is not to say that where there is fraud or new evidence, a decision by the election board could never be reopened. Absent such considerations, it is improper to reopen cases. Subject to the same considerations we have here, it appears that the election board would itself be barred from reopening the issue of appellees' eligibility for interim citizenship status. Section 7(f) of the Election Act provides that anyone who registered with the Board and has voted "is not required to register again, except when registration is necessary because of a change of identification or residency and, except where disqualifications enumerated by this Act have intervened ...." As appellants themselves have argued, plaintiffs either were or were not qualified for interim citizenship status on March 6, 1977, when the constitution was approved. That date was prior to passage of the Election Act. Thus in no sense can it be

said that, in the terms of § 7(f), "disqualifications enumerated by this Act have intervened" since the initial determination by the Board.

8. Appellees moved to dismiss this appeal on the ground that it was interlocutory and outside the jurisdiction of this court under 28 U.S.C. § 1291. The motion is denied because the appeal is from a grant of injunctive relief and thus properly within our jurisdiction under 28 U.S.C. § 1292(a)(1), which is applicable by virtue of 48 U.S.C. § 1694c (Supp.1982) and art. IV, § 403 of the Covenant. Pub. L. No. 94–241, 90 Stat. 263, 267 (1976), *reprinted in* 48 U.S.C. § 1681 note, at 239 (Supp.1982). Appellees have moved to dismiss this appeal on the ground that *Smith v. Pangilinan* renders this appeal moot. That motion is also denied.