**Decided November 4, 1985**

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS By

EDUARDO P. PANGILINAN, et al., ) CIVIL ACTION NO. 79-0006
 )
 Plaintiffs, )
 )
 vs. )
 )
FRANCISCO C. CASTRO, et al., ) DECISION GRANTING PARTIAL
 ) SUMMARY JUDGMENT
 Defendants, )
 )
 vs. )
 )
EDWIN MEESE III*, )
 )
 Intervenor. )
 )

I. Background

The pertinent history of this case has been adequately set forth by the Ninth Circuit in Smith v. Pangilinan, 651 F.2d 1320 (9th Cir. 1981) and in Pangilinan v. Castro, 688 F.2d 610 (9th Cir. 1982). The facts as they are relevant to this motion will be briefly reviewed here.

The named plaintiffs represent a class of eighty-five individuals who renounced their Filipino citizenship in order to qualify for citizenship in the new Commonwealth. These individ-

_____

*Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has substituted Attorney General Edwin Meese III in place of the original intervening official.

AO 72
(Rev. 8/82)

368

uals were certified eligible to vote in the first election of the officers of the new Commonwealth government by the Board of Elections which was established under the Election Act of 1977. The Election Act set standards for eligibility to vote by incorporating by reference the requirements for "interim United States citizenship" set forth in Section 8 of the Schedule on Transitional Matters in the Commonwealth Constitution. These eligibility requirements were substantively identical to those of United States citizenship set forth in the Covenant. Pangilinan v. Castro, 688 F.2d at 612. Section 301 of the Covenant provides:

> Section 301. The following persons and their children under the age of 18 years on the effective date of this Section, who are not citizens or nationals of the United States under any other provision of law, and who on that date do not owe allegiance to any foreign state, are declared to be citizens of the United States, except as otherwise provided in Section 302:
>
> (a) all persons born in the Northern Mariana Islands who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, and who on that date are domiciled in the Northern Mariana Islands or in the United States or any territory or possession thereof;
>
> (b) all persons who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, who have been domiciled continuously in the Northern Mariana Islands for at least five years immediately prior to that date, and who, unless under age, registered to vote in elections for the Mariana Islands District Legislature or for any municipal election in the Northern Mariana Islands prior to January 1, 1975; and

AO 72
(Rev.8/82)

> (c) all persons domiciled in the Northern
> Mariana Islands on the day preceding the
> effective date of this Section, who, although
> not citizens of the Trust Territory of the
> Pacific Islands, on that date have been
> domiciled continuously in the Northern
> Mariana Islands beginning prior to January 1,
> 1974.

The plaintiffs qualified under the section of the Election Act which duplicates the standards of Section 301(c), the Election Board having certified that the plaintiffs had satisfied the eligibility requirements.

In 1978, the newly elected Commonwealth legislature adopted the "Certificate of Identity Act of 1978" which, according to the title of the Act, was intented to

> "establish a procedure for the issuance of a
> Certificate of Identity to all persons in the
> Northern Mariana Islands who will derive
> citizenship of the United States of America
> upon termination of the Trusteeship Agreement
> and who are entitled to all the privileges
> and immunities of citizens in the several
> states of the United States."[1] [emphasis
> added]

Smith v. Pangilinan, 651 F.2d at 1322.

The plaintiffs' applications for Certificates of Identity were denied based on the determination of Francisco C. Castro, then Chief of the Immigration Division, that the plaintiffs did not meet the domicile requirements of the Identity Act, notwithstanding the previous determination of the Board of

_____

[1] Pursuant to Section 304 of the Covenant, "Citizens of the Northern Mariana Islands will be entitled to all privileges and immunities of citizens of the several States."

Elections to the contrary. This action followed.

On September 20, 1982, the Ninth Circuit affirmed the summary judgment decision of this Court which held that the Division of Immigration is effectively the successor agency to the Board of Elections and as such is barred by the doctrine of administrative res judicata from attempting to redetermine the issue of domicile. Pangilinan v. Castro, supra. The Certificates have been issued. The question now before the Court is whether the United States should be estopped from attempting to readjudicate the issue of the plaintiffs' domicile before granting the plaintiff Certificate holders the rights of United States citizenship.

II. Standard of Review

Summary judgment is appropriate only if it is demonstrated that there exists no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law. U.S. v. First National Bank of Circle, 652 F.2d 882, 887 (9th Cir. 1981). The Court must construe the pleadings, other record evidence and its attendant inferences most favorably to the party opposing the motion. Harlow v. Fitzgerald, 457 U.S. 800, 816, n.26, 102 S.Ct. 2727, 2737, n.26., 73 L.Ed.2d 396, 409 n.26 (1982). A genuine factual issue may exist only if a viable legal theory would entitle plaintiffs to judgment if they prove their asserted version of the facts. Ron Tonkin Gran Turismo v. Fiat Distributors, 637 F.2d 1376, 1381 (9th Cir. 1981), cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

AO 72
(Rev.8/82)

III. Equitable Estoppel

"Estoppel is an equitable doctrine designed to protect the legitimate expectations of those who have relied to their detriment upon the conduct of another." Russell v. Texas Co., 283 F.2d 636, 640 (9th Cir. 1956), cert. denied, 354 U.S. 938, 77 S.Ct. 1400, L.Ed.2d 1537 (1957). Though traditionally estoppel was not available against the government,[2] Utah Power and Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917), the modern trend is to ignore the distinction between government and private person and permit estoppel against the government where justice and fair play require it. United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir. 1973); Hansen v. Harris, 619 F.2d 942 (2nd Cir. 1980); Becker's Motor Transportation Inc. v. IRS, 632 F.2d 242 (3rd Cir. 1980); United States v. Fox Lake State Bank, 366 F.2d 962 (7th Cir. 1966).

The Ninth Circuit adopted the California test for estoppel in California State Board of Equalization v. Coast Radio Products, 228 F.2d 520 (9th Cir. 1955). The four necessary elements of estoppel under Coast Radio are:

> (1) The party to be estopped must know the facts;
>
> (2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

---

[2] It is interesting to note that the Court of Claims has been applying the estoppel doctrine against the United States where appropriate since as early as 1951. See, e.g., Branch Banking & Trust Co. v. United States, 98 F.Supp. 757 (Ct.Cl. 1951); Manloading and Management Associates, Inc. v. United States, 461 F.2d 1299 (Ct.Cl. 1972).

AO 72
(Rev.8/82)

372

(3) The latter must be ignorant of the true facts; and

(4) He must rely on the former's conduct to his injury. Id. at 525.

Applying this test in Gestuvo v. INS, 337 F.Supp. 1093 (C.D.Cal. 1971) the district court estopped the government from denying Gestuvo citizenship. After initially informing Gestuvo that he would be entitled to United States citizenship based on his employment status, the Immigration and Naturalization Service later changed its position. This was after Gestuvo had materially and detrimentally changed his plans and decided to live in the United States. The Service argued that the court should not grant Gestuvo citizenship because it might have the effect of disrupting United States immigration policies. But the court reasoned that "[a]ny disruption of the nation's immigration policies that might result from [Gestuvo's] admission. . . would . . . be miniscule in comparison to the hardship to which he would be subjected by a failure to estop the Service." Id. at 1102. Though this case lends support for imposing estoppel against the United States it has been modified by INS v. Hibi, 414 U.S. 5, 94 S.Ct 19, 38 L.Ed.2d 7 (1973), wherein the Supreme Court ruled that absent "affirmative misconduct" a government entity could not be estopped by the acts of its agents.

Unfortunately, the Court failed to define affirmative misconduct in Hibi and courts have been struggling with this slippery and imprecise term ever since. Santiago v. INS, 526 F.2d 488, 493 (9th Cir.1975). As a result there are seemingly

AO 72
(Rev.8/82)

divergent views of what the Supreme Court intended by "affirmative misconduct" See, e.g., United States v. Wharton, 514 F.2d 406 (9th Cir. 1975)(incorrect information by government agent rising to the level of a misrepresentation.); Tosco Corp. v. Hodel, 611 F.Supp. 1130 (D.C.Colo. 1985)(an affirmative act which, on balance of all the equities, amounts to "unconscientious or inequitable" behavior.); Tennessee ex. rel. Leech v. Dole, 567 F.Supp. 704 (M.D.Tenn. 1983)(inconsistent positions taken by two government agencies); Watkins v. United States Army, 551 F.Supp. 212 (W.D.Wash. 1982) (admitting, reclassifying, retaining and promoting plaintiff); Hansen v. Harris, supra (misinformation combined with misconduct). However, there are some guidelines that can be gleaned from these decisions. Whether a government's acts or omissions rise to the level of affirmative misconduct must be decided on a case-by-case basis. Lavin v. Marsh, 644 F.2d 1378, 1382-83 (9th Cir. 1981). Affirmative misconduct may be present where the government acts, for example gives incorrect information, or when it fails to act, such as its failure to warn of potential traps in its procedures. Tosco, 1130 F.Supp. at 1205. Finally, it is not actual fraud that triggers the estoppel doctrine but "unconscientious or inequitable behavior" that results in injustice. United States v. Georgia-Pacific Company, 421 F.2d 92, 97 n.5 (9th Cir. 1970).

Therefore, to hold the United States estopped from reexamining the domicile of these plaintiffs there must be a showing that, in addition to the four requisites for estoppel,

the United States is culpable of some type of conduct which on a balance of the equities amounts to affirmative misconduct.

## IV. Discussion

The principal source of the confusion which has emerged is the omission from Article III of the Covenant of any procedural mechanism by which those who qualify for United States citizenship will be identified. To be sure, those persons who do meet the eligibility requirements are entitled to be granted United States citizenship.[3/] Also, there is no doubt that the right to become United States citizens was considered by the Marianas delegates to the Political Status Commission to be a fundamental provision of the Covenant[4/]which could not be modified without the consent of the Government of the Northern Mariana Islands.[5/] However, when, where and by whom the identification is to be made is not set forth.

The Commonwealth has assumed the responsibility for identifying and issuing certificates to those persons who will

_____

[3/] Under Section 301, the persons who meet the qualifications "are declared to be citizens of the United States."

[4/] The fundamental nature of Article III and the need for the mutual consent limitation to assure maximum self-government for the people of the Northern Mariana Islands was recognized by the Marianas Political Status Commission (Statement of Edward DLG. Pangelinan, Chairman, Dec. 5, 1974, reprinted in S.Rep. No. 94-433, 94th Cong., 1st Session, 259, 264-265) and by the United States Congress (S.Rep.No. 94-433, 94th Cong., 1st Session, 58-59).

[5/] Covenant, Section 105.

AO 72
(Rev.8/82)

375

acquire United States citizenship upon the termination of the Trusteeship. The issue raised by the instant motion is what effect should be given to these determinations of eligibility made by the Commonwealth. The Attorney General contends that only the United States can ultimately determine eligibility for citizenship and accordingly reserves the right to review the determinations made by the Commonwealth. It should be made clear, however, that for the purposes of this motion, a determination as to where the authority does, or should, ultimately lie is not dispositive. What is of concern is not whether the United States actually delegated to the Commonwealth the authority to make the citizenship determination, but, whether the actions or inactions of the United States led the plaintiffs reasonably to believe that the Commonwealth legitimately exercised that authority. The Court concludes that based upon the duties, acts and omissions of the United States and based upon a balancing of the equities the United States is now estopped from reviewing the domicile determinations made by the Commonwealth.

Significant in the early development of what would become the present controversy is the failure of the United States to take advantage of opportunities to remedy what it now apparently considers misleading and deceptive signals given by the Commonwealth. Although the language of Covenant Article III may be unclear as to who is to make the citizenship determinations, it is evident that the Commonwealth believed it had this authority. As importantly, if the United States then

AO 72
(Rev.8/82)

held the position it herein advances that the Commonwealth does not have the authority, it took no steps to so notify the Commonwealth; in fact, the United States implicitly supported the Commonwealth's position.

Section 202 of the Covenant provides for the submission of the Constitution to the United States "for approval on the basis of its consistency with this Covenant and those provisions of the Constitution, treaties and laws of the United States to be applicable to the Northern Mariana Islands." The Constitution formulated and approved by the people of the Northern Mariana Islands included an Interim Definition of the Citizenship,[6] which, as previously noted adopts the substantive requirements of Article III.

_____

[6] Section 8 of the Schedule on Transitional Matter provides:

Interim Definition of Citizenship. For the period from the approval of the Constitution by the people of the Northern Mariana Islands to the termination of the Trusteeship Agreement, the term United States citizen or United States national as used in the Constitution includes those persons who, on the date of the approval of the Constitution by the people of the Northern Mariana Islands, do not owe allegiance to any foreign state and who qualify under one of the following criteria:

(a) persons who were born in the Northern Mariana Islands who are citizens of the Trust Territory of the Pacific Islands on the date of the approval of the Constitution by the people of the Northern Mariana Islands, and who on that date are domiciled in the Northern Mariana Islands or in the United States or any territory or possession thereof;

(b) persons who are citizens of the Trust Territory of the Pacific Islands on the date of the approval of the Consti-

AO 72
(Rev.8/82)

According to the Analysis of the Constitution of the Northern Mariana Islands (Marianas Printing ed. 1982), adopted by the Constitutional Convention on December 6, 1976 "to summarize the intent of the ... Convention in approving each section"[7/], the purpose of Section 8 is to identify those persons who would qualify for United States citizenship under the Covenant:

> The classes of persons described in this section include all the persons in the Northern Mariana Islands who will meet the criteria established by the Covenant for United States citizenship on the date of approval of the Constitution by the people. The intention is to include as many as possible of the individuals who will automatically became United States citizens or nationals when the Trusteeship ends. For this reason, the terms used in this section that are adopted from Section 301 of the Covenant should be interpreted consistently with Section 301. [Emphasis added.]

---

tution by the people of the Northern Mariana Islands, who have been domiciled continuously in the Northern Mariana Islands for at least five years immediately prior to that date, and who, unless under age, registered to vote in elections for the Mariana Islands District Legislature or for any municipal election in the Northern Mariana Islands prior to January 1, 1975; or

(c) persons domiciled in the Northern Mariana Islands on the date of the approval of the Constitution by the people of the Northern Mariana Islands who, although not citizens of the Trust Territory of the Pacific Islands, on that date have been domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974.

[7/]Analysis. p.1.

AO 72
(Rev.8/82)

Additionally, the Analysis includes an Oath of Renunciation for persons expecting to qualify for citizenship under Section 8(c). The language of the Oath further evidences the understanding of the Constitution's drafters that interim citizens as identified by the Commonwealth were to become United States citizens.[8]

---

[8] The Oath, Analysis, pp. 207-208, reads:

I, name , am a person eighteen years of age or older of sound mind and not subject to any duress ' or. coercion and am fully informed and aware of section 301(c) of the Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States that declares persons and their children under the age of eighteen to be citizens of the United States on the date the Trusteeship Agreement termi- nates. (unless they elect to be nationals of the United States) who are not already citizens or nationals of the United States or citizens of the Trust Territory of the Pacific Islands and who do not owe allegiance to any foreign state and who are domiciled in the Northern Mariana Islands on the day preceding the termination of the Trusteeship Agreement and who on that date have been domiciled continuously in the Northern Mariana Islands since December 31, 1973.

I am fully informed and aware that section 8(c) of the Schedule attached to the Constitution provides for the treat- ment of persons who meet the requirements of section 301(c) of the Covenant as United States citizens or United States nation- als as that term is used in the Constitution between the date the Constitution. takes effect and the date of termination of the Trusteeship Agreement, and am fully certain that I comply with the requirements of section 301(c) of the Covenant and section 8(c) of the Schedule.

I hereby expressly and voluntarily renounce any cit- izenship, nationality, or allegiance I might have to any country or state other than the United States for the purpose of availing myself of the opportunity to become a United States citizens [sic] or United States national, being fully informed and aware of the consequences of that act and of the duties and responsibilities of a United States citizen or United States national.

AO 72
(Rev.8/82)

379

On October 24, 1977, President Carter, with the advice of the Senate Committee on Energy and Natural Resources and the Subcommittee on National Parks and Insular Affairs of the House Committee on Interior and Insular Affairs, declared that the Constitution complies with the requirements of Article II of the Covenant. (Proclamation No. 4534, 42 Fed.Reg. 56, 593 (1977)). No comment was made regarding the interim definition of citizenship. The subsequent actions of the new Commonwealth government further evidenced their understanding as to Section 301 identification and their authority thereunder.

In 1978 the Commonwealth Legislature adopted the Certificate of Identity Act, the express purpose of which, as was noted earlier, was to identify those persons who will become citizens of the United States upon termination of the Trusteeship. Governor Camacho signed the bill into law and reaffirmed the intent of the Legislature that the Act will "expedite transition of the citizens of the Marianas to United States citizenship." Transmittal letter of Governor Camacho, July 14, 1978, Exhibit "A" to Defendants Motion for Summary Judgment filed July 16, 1980. On October 10, 1978, the Chief of Immigration published regulations concerning the issuance of Certificates of Identity. Section 301.2 of the regulations again reaffirmed the understanding that the Certificates were to identify those persons "who will derive United States citizenship on the effective date of Section 301" and "to facilitate travel into the United States by persons from the Northern Mariana

AO 72
(Rev. 8/82)

Islands." 1 Commonwealth Register 47, 48 (1978). In addition, the Chief had printed application forms which began:

> I hereby apply to the Chief of Immigration Service for a certificate showing that I will derive citizenship of the United States of America. Upon [sic] termination of Trusteeship Agreement.

The application ends with a recommendation to be signed by the Chief of Immigration that "the applicant will [/will not] derive United States citizenship under... § 301(a), or (b) or (c) of the Covenant... on the effective date of said section." Exhibit C to Defendants' Motion for Summary Judgment filed January 16, 1980. Despite these dispositive statements made to applicants by the Commonwealth regarding its authority to issue such certificates, the United States took no action to resolve this confusion (if in fact there was confusion) nor to establish a mechanism to determine Section 301 eligibility. More importantly, the United States did not communicate in any way with applicants, potential applicants or the Commonwealth that it did not intend to honor the Certificates as conclusive evidence of Section 301 qualification.

Nor was the Commonwealth clearly erroneous in its interpretation of its authority. The actions previously taken on the part of the United States reasonably could be interpreted by the Commonwealth as indicative of an intent to allow the Commonwealth to exercise the authority that it did. The Covenant establishes a relationship between the United States and the

///

Commonwealth which is unique among territorial relations.[9] Under Section 503 the immigration and naturalization laws of the United States will not be applicable unless and until made applicable by the Congress after the termination of the Trusteeship. "[T]he Northern Marianas will have local control over immigration." Covenant Analysis, p.56. The Commonwealth's power to control immigration of non-Americans to the Northern Mariana Islands unless and until Congress acts was acknowledged by the Congressional committees reviewing the Covenant.[10] The language and content of Section 503 indicates that the United States, while retaining plenary authority over immigration into the Northern Marianas, has conditionally relinquished that authority and delegated it to the Commonwealth. While it seems beyond dispute that a person admitted entry to the Northern Mariana Islands is not entitled to United States citizenship if he or she does not meet the Article III requirements, it is not so clear, and not unreasonable to conclude, based on the Commonwealth's authority over immigration, that the Commonwealth indeed has the authority to determine Article III eligibility.

---

[9] Commonwealth of the Northern Mariana Islands v. Atalig, 723 F.2d 682, 684 (9th Cir. 1984).

[10] See, e g., S.Rep.No. 94-433, 94th Cong., 1st Sess. 79 ("Northern Mariana Islands... will have the power to enact its own Immigration and Naturalization laws"); H.R.Rep.No. 94-364, 94th Cong., 1st Sess. 9 ("the Northern Marianas will have local control over immigration").

AO 72
(Rev.8/82)

It seems appropriate here to put these factors in the perspective needed to determine the instant motion. It should be reiterated that the actions of the United States will be examined to determine whether they support the plaintiffs' theory of equitable estoppel. In other words, did the plaintiffs reasonably rely, to their detriment, on the actions of the Commonwealth and was the United States then in a position to prevent any potential injustice?

The reasonableness of the plaintiffs' belief in the Commonwealth's authority is clear. The plaintiffs can be expected to reasonably rely on the validity of official statements and acts of government officials and agencies. This is especially so where the underlying law is unclear. The unequivocal nature of the statements made by the Commonwealth cannot be disputed. As set forth in detail above, the Certificate of Identity Act, the Governor's transmittal letter and the regulations all set forth in no uncertain terms the purpose of the established procedure to identify those citizens. Moreover, the Oath of Renunciation and the Application for the Certificate informed the plaintiffs that if they are determined by the Commonwealth to qualify, they will be issued a Certificate entitling them to United States citizenship at the termination of the Trusteeship. Perhaps most sensationally indicative of the Commonwealth's expression of its authority is the inclusion on the application form of an Oath of Allegiance apparently to be signed by the applicant upon approval of the Chief of Immigration.

AO 72
(Rev.8/82)

383

The Oath reads as follows:

OATH OF ALLEGIANCE

I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and the laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will bear arms on behalf of the United States when required by the law; that I will perform non-combatant service in the Armed Forces of the United States when required by the law; that I will perform work of national importance under civilian direction when required by the law; and that I will take this obligation freely without any mental reservation or purpose of evasion; SO HELP ME GOD. In acknowledgment whereof I have hereunto affixed my signature.

Set against these manifestations of the Commonwealth's apparent authority is found no notice by the United States that the right to become a United States citizen is further dependent upon a de novo determination of eligibility by the United States. Rather, the United States has lent credence to these expressions of authority by allowing Certificate holders unrestricted entry into the United States. Smith v. Pangilinan, 651 F.2d at 1324. Even if the directive of the Immigration and Naturalization Service allowing Certificate holders such entry does not bind the Service under principles of administrative res judicata,[11] it un-

_____

[11] The Court does not intend to preclude such a decision in the future; however, the issue is not here presented for determination.

384

questionably supports a belief on the part of Certificate applicants that the Commonwealth is indeed authorized to make the domicile determinations under Section 8 and Section 301.

That the plaintiffs relied to their detriment on the representations made is also evident. Pangilinan swore out his Oath of Renunciation on March 4, 1977, placing him, in the words of Resident Commissioner Erwin D. Canham, in the "hazard of statelessness." Deposition of Erwin D. Canham at 10 (Feb. 17, 1980). He has remained in the Northern Mariana Islands since March of 1972 and voted in both the 1977 and the 1979 elections. His family has already joined him here, and he has sold his property back in the Philippines. His application for a Certificate of Identity was turned down on November 6, 1978 -- eighteen months after he relinquished his Philippine citizenship in order to adopt and be part of his new-found home. The Court believes other members of the class express similar aspirations to adopt the Commonwealth as their home. These acts, especially the renunciation of citizenship leaving the plaintiffs as persons without countries sufficiently demonstrates the extreme detriment suffered by the plaintiffs.

Lastly, the United States, to be estopped, must have knowledge of the actions taken by the Commonwealth and those in reliance taken by the plaintiffs. Although there is no direct evidence in the record that the United States was aware of the events which transpired between 1977 and 1979, a denial of that knowledge by the United States would be incredible. The

United States explicitly approved the Constitution which included Section 8(c) of the Schedule on Transitional Matters. The United States had administered Micronesia under the Trusteeship Agreement for over thirty years when the Commonwealth constitutional government took office. It would be difficult, if not impossible, to believe that the United States so completely severed itself from the internal operations of the Commonwealth that it was absolutely unaware of the Certificate of Identity Act and related regulations and procedures. Moreover, many of the actions relied upon by the plaintiffs here transpired before the Commonwealth government assumed authority. During the voter registration the executive functions of the district government were being carried out by Erwin D. Canham, the resident commissioner, an appointee of the Department of the Interior. Canham was well aware of the events underlying this action. It was Canham who encouraged those persons seeking Section 8 and Article III citizenship to turn in to him their oaths of renunciation. See Deposition of Erwin D. Canham (Feb. 12, 1980) p.9. Moreover, while Canham did not act in any way on the oaths, he was fully aware that "action on them would have to be taken by some other authority than myself when the issue of registering to vote or seeking identity -- identification -- arose." Deposition p.9. Likewise, it is highly implausible that the officials at the headquarters of the Trust Territory, which represented the United States under the Trusteeship Agreement and which has remained on Saipan, can deny knowledge of the actions of the Commonwealth.

AO 72
(Rev.8/82)

386

Lastly, as discussed below, the United States remained a trustee to these people and had a duty to be informed on matters as fundamental as actions relating to future United States citizenship. Based on the foregoing, this Court is firmly convinced that the United States was in fact aware of the Commonwealth's actions in proceeding to accept oaths of renunciation and issue determinations of eligibility of United States citizenship.

The factors which this Court has considered above as elements of possible equitable estoppel support a decision which might be considered by some a close call. Whether these factors, standing alone, would support estoppel under common law principles of agency[12]/ or whether they would sufficiently meet the test for estoppel against a government are questions which need not be conclusively determined here for the Court relies not on these factors alone but as they relate to the unique status of the United States as a trustee.

It is now settled that the United States stands in relation to the peoples of Micronesia as a trustee. See, e.g., Palacios v. Commonwealth of the Northern Mariana Islands, Civ.App. No. 81-9017 (D.N.M.I.(App.Div.) 1983); Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir. 1980)("the entire authority of the United States in the Trust Territory is derived from a trust"); Ralpho v. Bell, 569 F.2d 607, 619 (D.C.Cir. 1977)("the United

_____

[12]/ See, e.g., Restatement (Second) of Agency §§ 8B, 12, 27, 31.

AO 72
(Rev.8/82)

States does not hold the Trust Territory in fee simple, as it were, but rather as a trustee"). In general, a fiduciary relation is described as one "in which the law demands of one party an unusually high standard of ethical or moral conduct with reference to another." G.G. Bogert and G.T. Bogert, The Law of Trusts and Trustees, p.3 (2nd Ed. 1965). The nature of the fiduciary obligations which the United States shoulders in its capacity as a trustee to a race or nation of peoples is well summarized in Smith v. United States, 515 F.Supp. 56, 60 (N.D.Cal. 1978), a decision based on the United States-Indian trust relationship. In Smith, Judge Sweigert describes those fiduciary duties as

> duties that must be exercised with 'great care,' United States v. Mason, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973), in accordance with 'moral obligations of the highest responsibility and trust,' that must be measured 'by the most exacting fiduciary standards.' Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942).

This Court previously has held that the "very purposes which engendered the judicially created Indian fiduciary doctrine apply a fortiori to the Micronesian-U.S. relationship." Palacios, supra, slip op. at 10.

Here, the United States has failed to exercise the "great care" that is required of it in ensuring that the inhabitants of the Micronesian islands are not misled to their extreme detriment. The United States, failing to clarify the mechanics of citizenship determination, has allowed the Common-

AO 72
(Rev.8/82)

388

wealth to define interim citizenship. The United States took no action as the interim government of the Northern Mariana Islands proceeded to register voters for the election of the constitutional government using the substantive criteria set forth in Section 301. The United States sat back and watched as the Commonwealth proceeded to identify and certify those persons qualified to become United States citizens. Only when this action was filed did the United States attempt to become involved. Yet, it did not seek to address the underlying problem and develop a mechanism for an orderly determination, but proceeded to attack the Certificate of Identity process piecemeal by challenging only those persons who are plaintiffs herein. In the meantime, persons such as plaintiffs, in reliance on the actions of the Commonwealth, renounced their foreign citizenship and became stateless. Now the United States seeks to challenge the actions of the Commonwealth with respect to these plaintiffs, and apparently, none other. What is to become of those plaintiffs whom the United States decides not to certify under Section 301 who have already been declared to be interim citizens of the United States and who have been issued their Certificates of Identity? They are now interim United States citizens in the Commonwealth entitled to entry to the United States. Upon the termination of the Trusteeship Agreement, must there be three classes of persons: aliens, citizens/nationals, and others residing in the void of statelessness, the latter created not by choice but by government action?

AO 72
(Rev.8/82)

389

The United States led these plaintiffs, and others, to believe that upon termination of the Trusteeship they would be full-fledged United States citizens. The Immigration and Naturalization Service apparently honored the Commonwealth's determination of interim citizenship by allowing these interim citizens to freely pass through immigration as if they were United States citizens. At the same time the United States, the trustee of the islands, failed to inform these individuals that they were not entitled to United States citizenship despite the fact that it was being represented to them that they were so entitled.

This course of action is not compatible with the responsibility of the United States to exercise its trusteeship duties in accordance with the "moral obligations of the highest responsibility and trust." Rather, the United States has failed in its fiduciary capacity. The Court today determines that the Attorney General is now equitably estopped from seeking a new determination of domicile as to the plaintiffs herein. Only in this manner can justice be done to these plaintiffs who in reliance on the actions and omissions of both the Commonwealth and the United States have risked all that they had to pass through the golden gates so proudly displayed by the United States. It would be too late in equity and good conscience to now close those gates.

The plaintiffs' motion for partial summary judgment is GRANTED.

AO 72
(Rev.8/82)

DATED this _____4th_____ day of November, 1985.

_____
JUDGE ALFRED LAURETA