Xianli **ZHANG, Guimin Lu, Bao Hua He, Baowei Ding, and Jilin Hu, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Hyunjin (Saipan) Corporation, Plaintiff,**

v.

**The United States, Defendant.**

**Nos. 08–269T, 08–270T.**

United States Court of Federal Claims.

Sept. 22, 2009.

David W. Axelrod, Portland, OR, for plaintiffs Xianli Zhang, Guimin Lu, Bao Hua He, Baowei Ding, and Jilin Hu. Marc K. Sellers and Connie C. Kong, Schwabe, Williamson & Wyatt, P.C., Portland, OR, of counsel. Alexis A. Fallon, Southborough, MA, for plaintiff Hyunjin Corp. David W. Axelrod and Marc K. Sellers, Schwabe, Williamson & Wyatt, P.C., Portland, OR, of counsel.

Robert C. Stoddart, Washington, DC, with whom was Acting Assistant Attorney General John A. DiCicco, for defendant.

## MEMORANDUM OPINION AND ORDER

CHRISTINE O.C. MILLER, Judge.

This case of first impression is before the court, after argument on defendant's motion for judgment on the pleadings, involves excise taxes imposed under a compact and implementing legislation formalizing the relationship of the United States Commonwealth of the Northern Mariana Islands (the "CNMI") and the United States. The issue to be decided is whether nonresident aliens working in the CNMI and a corporate employer owe taxes under the Federal Insurance Contribution Act, 26 U.S.C. (I.R.C.) §§ 3101, 3111 (2006) ("FICA"), for work performed while in the CNMI.

### FACTS

The application of FICA taxes to the CNMI is the centerpiece of these tax refund claims. FICA taxes are assessed as part of the payroll withholding tax on employee wages. See I.R.C. § 3101(a) (taxing 6.2% of employee wages). Employers also pay an excise tax equal to the amount of the employee FICA percentage. See I.R.C. § 3111(a) (imposing matching 6.2% excise tax). I.R.C. § 3121(b) defines "employment" as "any service, of whatever nature, performed (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) within the United States." Id. The parties disagree on the definition of "within the United States" in the context of FICA. The Internal Revenue Code (the "I.R.C.") provisions governing FICA define "United States" as, when "used in a geographical sense includ[ing] the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa." I.R.C. § 3121(e)(2).

Five citizens of the People's Republic of China—who were temporary contract workers for various employers located in the CNMI, including the Hyunjin (Saipan) Corporation—filed a complaint in the United States Court of Federal Claims on April 14, 2008, amended most recently on July 30, 2008. The case was consolidated on October 7, 2008, with a companion complaint filed by plaintiff Hyunjin on July 29, 2008, which seeks reimbursement for all FICA taxes paid to hundreds of employees. The claims cover refunds for FICA taxes paid to the United States between 2004 and 2007. Plaintiffs contend that FICA taxes are not applicable to wages received or paid by noncitizens and nonresidents relating to employment in the CNMI because the CNMI is not considered "within the United States" for purposes of I.R.C. § 3121(b). In 1976 the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Act of March 24, 1976, Pub.L. No. 94–241, 90 Stat. 263 (codified as amended at 48 U.S.C. § 1801 note (2006)) (the "Covenant"), normalized the relationship between the United States and the Northern Mariana Islands. Plaintiffs also contend that congressional legislation amended the Covenant to proscribe FICA taxes from applying to nonresident aliens working in the CNMI.

Defendant responded with a motion for judgment on the pleadings, advancing that the CNMI is embraced as part of the United States ("within the United States") under the Internal Revenue Code by its relationship with Guam through the Covenant; that section 606(b) of the Covenant expressly applies the FICA excise tax on the corporate plaintiff; that the legislative history of section 606(b) shows that the FICA tax applies to the individual plaintiffs; and that other provisions of the Covenant subject the individual plaintiffs to FICA taxes, even if section 606(b) does not do so. During argument the parties agreed that plaintiffs essentially had cross-moved for judgment in their favor, and the court proceeds accordingly.

## DISCUSSION

### I. *Standard of review*

#### 1. *Motion for judgment on the pleadings*

 A motion for judgment on the pleadings filed pursuant to RCFC 12(c), which is identical to Fed.R.Civ.P. 12(c), provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings is granted when "there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Labs., Inc. v. United States,* 476 F.3d 877, 881 (Fed.Cir. 2007) (citation omitted); *see also Owen v. United States,* 851 F.2d 1404, 1407 (Fed.Cir. 1988) (explaining that motion for judgment on pleadings is granted when "it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim" (internal quotation omitted)).

### II. *The Covenant*

#### 1. *Background of the CNMI*

The Northern Mariana Islands (the "NMI") comprise the northern islands of the Mariana archipelago. Guam, the southernmost island, has been a separate political entity under the sovereignty of the United States since the Spanish American War in 1898. *See Saipan Stevedore Co. v. Dir., Office of Worker's Comp. Programs,* 133 F.3d 717, 720 (9th Cir.1998). After the Spanish American War, the NMI came under German and then Japanese dominion. The NMI was occupied by the United States military at the close of World War II. In 1947 Micronesia, including the NMI, was designated the United Nations Trust Territory of the Pacific Islands ("Trust Territory") by the United Nations, and the United States was appointed Trustee. *See id. (citing* Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, U.S.-N. Mar. I., art. 3, 61 Stat. 3301, 3302; Proclamation No. 5564, 51 Fed.Reg. 40,399–400 (Nov. 3, 1986)). As Trustee, the United States "was

placed in a temporary guardian relationship with the trust territories for the purpose of fostering the well-being and development of the territories into self-governing states." *Id.* (internal quotation omitted). The relationship between the United States and the Trust Territories was governed by a Trusteeship Agreement (the "Trusteeship Agreement") between the Security Council of the United Nations and the United States. Under the Trusteeship Agreement, the United States did not have sovereignty over the NMI, but was empowered to apply federal laws to the NMI, and NMI citizens were not citizens or nationals of the United States. *See id.*

Beginning in the early 1970s, the NMI sought a permanent union with the United States, and the Marianas [1] Political Status Commission entered into negotiations with the United States. In 1975 the Marianas Political Status Commission and the Ford Administration negotiated and signed the Covenant. The Covenant was approved by the CNMI voters in a plebiscite and by a resolution of the United States Congress and thereafter signed into law by President Gerald Ford on March 24, 1976. *See* 48 U.S.C. § 1801 note. The Covenant was drafted to govern the relations between the NMI and the United States.

The Covenant contemplates that, unlike most U.S. territories, the " 'Marianas constitution and government structure will be a product of a Marianas constitutional convention....' " *Saipan Stevedore Co.,* 133 F.3d at 721 n. 9 (*quoting* S.Rep. No. 94–596, at 2 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 448, 449). The people of the NMI drafted and approved a constitution, which was approved by proclamation of President Jimmy Carter on October 24, 1977. *See* Proclamation No. 4534, 42 Fed.Reg. 56,593–94 (Oct. 27, 1977). The NMI Constitution became effective on January 9, 1978, the date on which the first elected governor of the NMI took office.

Most provisions of the Covenant became effective upon its approval in 1976 or the effective date of the NMI Constitution. The

---

1. The court uses the spelling "Marianas" or "Mariana" depending on the appellation for this

island chain reflected in the particular historical document under discussion.

Covenant contemplated that the CNMI would come into existence and supercede the NMI upon the termination of the Trusteeship Agreement at an unspecified date. The entire Covenant became effective on January 1, 1987, and the CNMI entered into full union with the United States, when President Ronald Reagan issued a proclamation terminating the Trusteeship Agreement on November 3, 1986. *See* Proclamation No. 5564, 51 Fed. Reg. 40,399–400 (Nov. 3, 1986).[2]

2. *Interim period between the approval of the Covenant and the termination of the Trusteeship Agreement*

Anticipating that other U.S. laws would be applicable to the NMI, the Covenant called for the appointment of a Commission on Federal Laws to designate those laws and the extent of their reach and to report their findings to Congress. *See* Covenant § 504, *reprinted in* 48 U.S.C. § 1801 note. The Northern Mariana Islands Commission on Federal Laws (the "Commission") was established, which published several interim reports in the years between the approval of the Covenant in 1976 and the termination of the Trusteeship Agreement in 1987. The parties have made the application and interpretation of the legislative history surrounding the Covenant during this period a pivotal aspect of this litigation.

The Commission issued its first interim report to Congress in January 1982. *See* N. Mariana Islands Comm'n on Fed. Laws, an Interim Report of the N. Mariana Islands Comm'n on Fed. Laws to the Congress of the United States 73 (1982) (hereinafter "First Interim Report"). The First Interim Report examined hundreds of federal laws that could apply to the NMI, including U.S. Social Security laws that limited the application of federal benefits to U.S. citizens. *See* First Interim Report at 4. The report recommended that Congress enact legislation "to extend certain statutory rights and privileges of U.S. citizenship to citizens of the Northern Mariana Islands prior to their becoming citizens of the United States." *Id.*

In December 1983 Congress implemented many of the recommendations of the First Interim Report and accorded the U.S. President several powers, including the power through proclamation to make U.S. citizenship and nationality requirements listed in the First Interim Report inapplicable to the citizens of the NMI. *See* Act of December 8, 1983, Pub.L. No. 98–213, § 19(a), 97 Stat. 1459, 1464 (the "1983 Act"). Section 19(b) of the 1983 Act exempts aliens from statutes that deny benefits or impose burdens or disabilities if those aliens have not become citizens of the United States, which, as aliens, they likely have not. Section 19 provides:

(a) The President may, subject to the provisions of section 20 of this Act, by proclamation provide that the requirement of United States citizenship or nationality provided for in any of the statutes listed on pages 63–74 of the Interim Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States, dated January 1982 and submitted pursuant to section 504 of the Covenant, // 48 USC 1681. // shall not be applicable to the citizens of the Northern Mariana Islands. The President is authorized to correct clerical errors in the list, and to add to it provisions, where it appears from the context that they were inadvertently omitted from the list.

(b) A statute which denies a benefit or imposes a burden or a disability on an alien, his dependents, or his survivors shall, for the purposes of this Act, be considered to impose a requirement of United States citizenship or nationality.

§ 19, 97 Stat. at 1464. President Reagan issued a proclamation on June 7, 1984, implementing the citizenship waiver contained in the 1983 Act. *See* Proclamation No. 5207, 49 Fed.Reg. 24,365 (June 7, 1984).

In August 1985 the Commission issued a second interim report. *See* N. Mariana Islands Comm'n on Fed. Laws, Welcoming America's Newest Commonwealth, the Sec-

---

**2.** While President Reagan issued the proclamation on November 3, 1986, the Act of December 8, 1983, Pub.L. No. 98–213, § 19(a), 97 Stat. 1459, 1464 (the "1983 Act"), changed the expiration date of Covenant section 606(b) from the date of termination of the Trusteeship Agreement to January 1 of the next calendar year.

ond Interim Report of the N. Mariana Islands Comm'n on Fed. Laws to the Congress of the United States (1985) (hereinafter the "Second Interim Report").[3] The Second Interim Report provided Congress with a more detailed analysis of federal laws and their interaction with the Covenant. In its analysis of the Internal Revenue Code, the Commission discusses the applicability of FICA taxes to the NMI, explaining:

> Employers and employees in the Northern Mariana Islands are made subject to taxes imposed by the Federal Insurance Contributions Act to support the federal social security system at the time the social security systems of the Northern Mariana Islands and the United States are merged (either at the end of the trusteeship or an earlier date set by agreement between the Northern Mariana Islands and the United States). The self-employment tax, imposed on self-employed individuals for the same purpose, also becomes effective in the Northern Mariana Islands at that time.

Second Interim Report at 415.

### 3. *The Structure of the Covenant*

A critical first step to the court's analysis is examining the overall structure of the Covenant in order to discern how specific provisions of the Covenant interact with each other.

Article I of the Covenant defines the political relationship between the NMI and the United States. Covenant section 101 provides that the NMI are to become a semiautonomous commonwealth under the United States' territorial sovereignty. Section 101 states: "The Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth to be known as the 'Commonwealth of the Northern Mariana Islands,' in political union

with and under the sovereignty of the United States of America." Covenant § 101. Section 102 provides that the Covenant governs the relations between the United States and the NMI, and the supreme law of the NMI includes the Covenant, certain provisions of the U.S. Constitution, and other federal treaties and laws. *See id.* § 102.

While the internal affairs of the people of the NMI are governed by local self-government, *id.* § 103, the Covenant grants the United States authority to enact new laws that are made applicable to the NMI by operation of Covenant section 105. Section 105 emphasizes that the power of the United States to enact legislation is limited only by the prohibition against modifying certain organic provisions of the Covenant without the agreement of the Government of the NMI, none of which are at issue in this litigation, other than section 105 itself. Section 105 prescribes:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III[ [4]] and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

*Id.* § 105.

Article II provides for the Constitution of the Northern Mariana Islands, establishing a

---

**3.** Pursuant to the mandate imposed by Covenant section 504, the Commission issued a final report in 1986. *See* N. Mariana Islands Comm'n on Fed. Laws, Final Report of the N. Mariana Islands Comm'n on Fed. Laws to the Congress of the United States (1986). Because the parties have not cited any provisions in the Final Report relevant to FICA's application to the CNMI, and because it was published after the termination of the Trusteeship Agreement, *See* Covenant § 504 ("The Commission will make its final report and

recommendations to the Congress within one year after the termination of the Trusteeship Agreement ...."), the Final Report has no relevance to the court's analysis.

**4.** Article I sets forth the "Political Relationship"; Article II, the "Constitution of the Northern Mariana Islands"; and Article III, "Citizenship and Nationality."

tripartite, republican form of government. Article III delineates the requirements for citizenship and nationality in the NMI. Article IV establishes the jurisdiction of U.S. judicial authority in the NMI. None of these articles are implicated in this case.

Article V addresses the applicability of federal laws to the NMI. Section 502(a) of the Covenant provides the baseline: "The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant." *Id.* § 502(a). Section 502(a) lists those laws:

(1) those laws which provide federal services and financial assistance programs and the federal banking laws as they apply to Guam; Section 228 of Title II and Title XVI of the Social Security Act as it applies to the several States; the Public Health Service Act as it applies to the Virgin Islands; and the Micronesian Claims Act as it applies to the Trust Territory of the Pacific Islands;

(2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States; and

(3) those laws not described in paragraphs (1) or (2) which are applicable to the Trust Territory of the Pacific Islands, but not their subsequent amendments unless specifically made applicable to the Northern Mariana Islands, as they apply to the Trust Territory of the Pacific Islands until termination of the Trusteeship Agreement, and will thereafter be inapplicable.

*Id.* § 502(a).

Section 503 exempts the NMI from the jurisdictional reach of the immigration laws of the United States. It grants to the NMI exclusive control over its own immigration laws and policies. Section 503 provides: "The following laws of the United States . . . will not apply to the Northern Mariana Islands except in the manner and to the extent made applicable to them by the Congress by law after termination of the Trusteeship Agreement: (a) . . . the immigration and nat-uralization laws of the United States. . . ." *Id.* § 503.

Anticipating the unintended consequences likely to result from those U.S. laws that automatically would become applicable to the NMI under section 502, the Covenant mandated the establishment of the Commission to select which U.S. laws to apply to the NMI and the extent of their reach in the NMI. Section 504 provides:

The President will appoint a Commission on Federal Laws to survey the laws of the United States and to make recommendations to the United States Congress as to *which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner* . . . . The Commission will make its final report and recommendations to the Congress within one year after the termination of the Trusteeship Agreement, and before that time will make such interim reports and recommendations to the Congress as it considers appropriate to facilitate the transition of the Northern Mariana Islands to its new political status. In formulating its recommendations the Commission will take into consideration the potential effect of each law on local conditions within the Northern Mariana Islands, the policies embodied in the law and the provisions and purposes of this Covenant.

*Id.* § 504 (emphasis added).

Article VI of the Covenant governs "Revenue and Taxation." Section 601 calls for the adoption of an income tax system for the NMI, replicating Guam's territorial income tax system in the NMI. Section 601(a) provides: "The income tax laws in force in the United States will come into force in the Northern Mariana Islands as a local territorial income tax on the first day of January following the effective date of this Section, in the same manner as those laws are in force in Guam." Id. § 601(a). Section 601(b) further provides: "Any individual who is a citizen or a resident of the United States, of Guam, or of the Northern Mariana Islands (including a national of the United States who is not a citizen), will file only one income tax return with respect to his income, in a

manner similar to the provisions of Section 935 of Title 26, United States Code." Id. § 601(b).

█ The United States Court of Appeals for the Ninth Circuit reviews appeals from the CNMI. See 48 U.S.C. § 1821(a) (2006) (placing CNMI in same judicial circuit as Guam); 28 U.S.C. § 41 (2006) (placing Guam in Ninth Circuit). While not bound by the Ninth Circuit's decisions, this court properly is guided by the Ninth Circuit's decisions regarding the CNMI and considers its construction of the Covenant to be authoritative. See Bank of Guam v. United States, 578 F.3d 1318, 1326 n. 4 (Fed.Cir.2009) (stating that although not binding, "the decisions of other circuits are persuasive authority and instructive").

Guam's Territorial Income Tax (the "GTIT") is referred to by courts as a "mirror code" income tax system. See Armstrong v. Commonwealth of the N. Mariana Islands, 576 F.3d 950, 952–53 (9th Cir.2009). "By instituting the GTIT, Congress decided to 'mirror' the IRC, rather than create an entirely new tax code for Guam. In other words, ... IRC § 1 applies to Guam taxpayers as GTIT § 1." Bank of Guam, 578 F.3d 1318. Article VI "mirrors" the Internal Revenue Code by "substituting certain terms in the IRC for terms pertinent to [the NMI], such as replacing 'United States' with [NMI]." Id. The tax is thus collected and spent by the NMI, relieving the U.S. Treasury from having to make direct appropriations. See id.

Section 601(c) applies U.S. income tax laws to the NMI as those laws are enforced in Guam. Subsection c also issues the clarion call for the respective exegesis of statutory construction put forth by the opposing parties: "References in the Internal Revenue Code to Guam will be deemed also to refer to the Northern Mariana Islands, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof or of this Covenant." Covenant § 601(c).

Section 604 allows the United States to levy excise taxes in pari materia with Guam and establishes a qualified reciprocity on the part of the Government of the NMI. See id. § 604. Section 605 prohibits the Govern-

ment of the NMI from imposing customs duties on United States property. See id. § 605.

Section 606 contemplates the application of the U.S. Social Security system to the NMI and ensures that the people of the NMI receive Social Security benefits without interruption. See id. § 606. Section 606(a) provides for the establishment of the Northern Mariana Islands Social Security Retirement Fund, which is to be administered by the United States. See id. § 606(a). Section 606(b) applies FICA taxes to the NMI as they are applied to Guam:

Those laws of the United States *which impose excise and self-employment taxes to support or which provide benefits from the United States Social Security System* will on January 1 of the first calendar year following the termination of the Trusteeship Agreement or upon such earlier date as may be agreed to by the Government of the Northern Mariana Islands and the Government of the United States become applicable to the Northern Mariana Islands as they apply to Guam.

Id. § 606(b) (emphasis added).

On its face, section 606(b) seems to apply only the FICA excise tax on employers (I.R.C. § 3111) and the Self–Employment Contributions Act (the "SECA") tax on self-employed individuals (I.R.C. § 1401) and omits the FICA tax on employees (I.R.C. § 3101). Whether the Covenant through section 606 or another provision applies the FICA tax on employees' wages and employers is the issue that creates controversy. Under section 606(c), the Northern Mariana Islands Social Security Retirement Fund automatically merges with the Federal Social Security system upon the time specified in subsection b. See id. § 606(c).

The Covenant also mandates that, except for FICA tax proceeds, income and other tax revenues shall be remitted to the Treasury of the CNMI instead of the U.S. Treasury. Section 703(b) contemplates:

There will be paid into the Treasury of the Government of the Northern Mariana Islands, to be expended to the benefit of the people thereof as that Government

may by law prescribe, the proceeds of all customs duties and federal income taxes derived from the Northern Mariana Islands, the proceeds of all taxes collected under the internal revenue laws of the United States on articles produced in the Northern Mariana Islands and transported to the United States, its territories or possessions, or consumed in the Northern Mariana Islands, the proceeds of any other taxes which may be levied by the Congress on the inhabitants of the Northern Mariana Islands, and all quarantine, passport, immigration and naturalization fees collected in the Northern Mariana Islands, except that nothing in this Section shall be construed to apply to any tax imposed by Chapters 2 or 21 of Title 26, United States Code.

*Id.* § 703(b). In other words, section 703(b) implements the territorial income tax provisions provided for in sections 601(a) and (b), but it does not apply to FICA taxes collected under section 606(b), which are paid to the U.S. Treasury. The structure of the Covenant makes clear that the tax and revenue provisions in Article VI are self-referential. The relevant subject matter that falls within the scope of Article VI—the NMI income tax and the federal FICA tax—is not implicated by Articles I or V.

III. *Applicability of FICA taxes to the CNMI*[5]

1. *The definition of "within the United States" for the purposes of FICA*

The parties agree that a nonresident alien worker must be employed "within the United States" in order to be subject to FICA taxes. However, plaintiffs contend that the CNMI is not considered "within the United States" under FICA, while defendant insists to the contrary.

Plaintiffs cite Title II of the Social Security Act, Federal Old–Age, Survivors and Disability Income Benefits, 42 U.S.C. §§ 401–34 (2006) (the "OASDI"), as defining the prerequisites of working "within the United States" for the purposes of FICA. They proffer that

*Moorhead v. United States,* 774 F.2d 936, 941 (9th Cir.1985), ruled that the Immigration Naturalization Act, 8 U.S.C. §§ 1101–1503 (2006) (the "INA"), determines "an alien's employment authorization within the 'United States' for the purposes of the IRC." Pls.' Br. filed Mar. 11, 2009, at 9. Without elaboration, plaintiffs conclude that the CNMI is not "in the United States" for FICA purposes because section 503(a) of the Covenant renders the INA inapplicable to the CNMI.

Defendant rejoins that the INA is irrelevant to defining the term "within the United States" under the Internal Revenue Code. Instead, defendant invokes the definition of "within the United States" in I.R.C. § 3121(e)(2) and section 606(b) of the Covenant to argue that the CNMI is "within the United States" for purposes of FICA. Defendant discounts the holding of the Ninth Circuit in *Moorhead* because that court was applying an exemption from FICA's definition of employment for foreign agricultural workers "lawfully admitted to the United States ... on a temporary basis," I.R.C. § 3121(b)(1), not FICA's definition of the "United States" under I.R.C. § 3121(e)(2).

Plaintiffs' reliance on *Moorhead* is not on point. In *Moorhead,* U.S. employers sought refunds of FICA taxes on wages paid to Mexican agricultural workers who commuted from Mexico during harvest season to work on California farms. *See* 774 F.2d at 938–39. The court was required to decide "whether an alien 'commuter' commuting daily or seasonally to the United States to perform agricultural labor in the United States is exempt from [FICA], under the foreign-agricultural-worker exemption of [I.R.C. § 3121(b)(1) ]." *Id.* at 938. In doing so, the court construed "lawfully admitted to the United States" as the term is used in § 3121(b)(1). In explicating I.R.C. § 3121(b)(1), the Ninth Circuit acknowledged that neither FICA nor the Social Security Act contained a definition of the term "lawfully admitted." *Id.* at 941. Given the absence of a definition in FICA, the court concluded that Congress intended to incorporate the INA's definition. *Id.*

---

5. The court uses the convention "CNMI" to refer to NMI in the Covenant, which is now the applicable statutory law.

Nothing in *Moorhead* supports plaintiffs' assertion that the Ninth Circuit held that the INA "govern[s] the determination of 'in the United States' for internal revenue purposes." Pls.' Br. filed Mar. 11, 2009, at 21. Therefore, even if the Ninth Circuit's decision were given weight because it is the epicenter of appellate activity for the NMI, the holding is not determinative.

■ *Moorhead* confined the INA's definition of "lawfully admitted" to the singular FICA exemption for a category of foreign workers. At issue in the case at bar, in contrast, is the definition of the term "United States" as it is used in I.R.C. § 3121(e)(2), not "lawfully admitted" as it applies to I.R.C. § 3121(b)(1). As defendant correctly observes, I.R.C. § 3121(e)(2) defines "within the United States" to include Guam for the purposes of Chapter 21 of the Internal Revenue Code or FICA. Consequently, FICA defines "within the United States" vis-á-vis the CNMI, as follows: "The term 'United States' when used in a geographical sense includes the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa." I.R.C. § 3121(e)(2). However, because I.R.C. § 3121(e) does not expressly include the NMI, plaintiffs and defendant disagree whether the Covenant provides the essential link.

2. *Whether the Covenant renders the CNMI a part of the "United States" as defined by I.R.C. § 3121(e)(2)*

1) *The parties' arguments*

Because I.R.C. § 3121(e)(2) defines the United States to include Guam, and the Covenant applies FICA taxes to the CNMI that are applied in Guam, defendant reasons that the CNMI is, by association with Guam through the Covenant, "in the United States" and subject to FICA taxation. Defendant relies on several sections of the Covenant as support.

First, defendant argues that I.R.C. § 3121(e)(2) encompasses the CNMI through application of section 606(b) of the Covenant. Defendant submits that section 606(b) applies all FICA taxes in the CNMI as they are applied in Guam, including both FICA excise

taxes on employers and employee FICA taxes on temporary laborers. While section 606(b) facially applies only the FICA excise tax on employers and the SECA tax (not at issue in this litigation), defendant would apply section 606(b) of the Covenant to the employee FICA tax.

Defendant's inclusion of the employee FICA tax within section 606(b) of the Covenant is premised on legislative history, which clarifies an "imperfect[ ] express[ion of] the intent of [section 606(b)'s] drafters," Def.'s Br. filed June 23, 2009, at 6, convincing defendant that the apparent omission should be attributed to a "scrivener's error." *Id.* at 7. Defendant quotes reports from both the House of Representatives and Senate issued prior to Congress's approval of the Covenant: "Subsection (b) [of Covenant § 606] assures that the laws of the United States which impose taxes to support ... the United States Social Security System will become applicable to the Northern Marianas as they are applicable to Guam upon termination of the Trusteeship Agreement...." H.R.Rep. No. 94–364, at 11 (1975); *accord* S.Rep. No. 94–433, at 83 (1975) (*quoted at* Def.'s Br. filed June 23, 2009, at 6).

Defendant also refers to the Section–by–Section Analysis of the Covenant To Establish a Commonwealth of the Northern Mariana Islands, published by the Northern Marianas Political Status Commission (also drafters of the Covenant), which used identical language to describe subsection b of Section 606 of the Covenant. *See* Northern Marianas Political Status Commission, Section–by–Section Analysis 80 (1975) (hereinafter "Section–by–Section Analysis"). Defendant quotes the Commission on Federal Laws for further support: "Employers and employees in the Northern Mariana Islands are made subject to taxes imposed by the Federal Insurance Contributions Act to support the federal social security system...." *See* Second Interim Report, *supra*, at 415 (*quoted in* Def.'s Br. filed June 23, 2009, at 7). Because the Covenant does not reflect any express intent to exclude CNMI employees from the FICA tax, defendant defers to legislative history to illuminate the congressional intent, which defendant argues is con-

clusive that section 606(b) expressly applies the employer FICA excise tax and implicitly applies the employee FICA tax to the CNMI.

Defendant also argues that construing section 606(b) of the Covenant literally to exclude the employee FICA tax would produce an absurd result. Under this reading, any employee working in the CNMI could receive the full amount of Social Security benefits, but pay nothing for them. On the other hand, while a self-employed person in the CNMI could perform the same work as the employee, the former nevertheless is liable for the full SECA double tax, while the exempt employee receives the same benefits having paid nothing for them.

Alternatively, defendant argues that, if section 606(b) of the Covenant is construed to apply only the FICA excise tax and the SECA tax to the employer, then, upon its effective date, the employee FICA tax applies to the CNMI by operation of either sections 502(a)(2) or 601(c).

According to defendant, the CNMI is not listed in I.R.C. § 3121 because of the CNMI's relationship with Guam through section 502 of the Covenant. Section 502(a)(2) of the Covenant, as previously quoted, applies to the CNMI "(2) those laws not described in paragraph (1) [providing 'federal services and financial assistance programs and the federal banking laws as they apply to Guam'] which are applicable to Guam and which are of general application to the several States...." Covenant § 502(a)(2). Given that I.R.C. § 3121(e)(2) includes Guam in the term "United States," defendant posits that, because no law enacted pursuant to section 504 of the Covenant rendered FICA inapplicable to the CNMI, the CNMI, through its embrace of all laws of general application that are applicable to Guam in section 502(a)(2) of the Covenant, is also within the United States.

Defendant also maintains that the employee FICA tax applies to the CNMI through Covenant section 601(c).[6] Because Guam is included in the term "United States" in I.R.C. § 3121(e)(2), and because the employee FICA tax applies to Guam, the FICA tax therefore applies to the CNMI. Defendant notes that, while section 601(c) appears in that part of the Covenant dealing with income taxes, the provision's legislative history evidences Congress's intent that its scope extends to the entire Internal Revenue Code, not to income taxes alone. Defendant cites S.Rep. No. 94–433, which provides: "[601(c)] assures that the benefits which are available to Guam under the Internal Revenue Code will also be available to the Northern Mariana Islands. These benefits include, for example, 26 U.S.C. § 7653(b) which exempts articles shipped from the United States to Guam from certain federal excise taxes." S.Rep. No. 94–433, at 80. Defendant gleans from this history that, if that excise tax benefit applies to the CNMI as it applies to Guam under section 601(c), section 601(c) is not limited to income taxes. Rather, section 601(c) applies the entire I.R.C., as its language suggests, including FICA.

Plaintiffs respond that section 606(b) of the Covenant, by its express terms, does not include the tax on employees;[7] that sections 601(c) and 502(a)(2) do not apply to FICA taxes—both by their express terms and by operation of section 703(b); and that the CNMI is not within the term "United States" in a geographic sense for I.R.C. § 3121(e)(2) purposes because subsequent legislation establishes that aliens working in the CNMI were exempted from FICA taxes.

Plaintiffs construe section 502(a)(2) of the Covenant as inapplicable to all tax laws. They regard Covenant Article VI as dealing exclusively with all tax matters under the Covenant. To buttress this argument, plaintiffs argue that Articles VI and V conflict insofar as section 502(a)(2) applies federal laws "as they are applied 'to the States,' not as to Guam," whereas Article VI taxes are applied to the CNMI "as they are applied 'in Guam' not as to the states." Pls.' Br. filed

---

**6.** Section 601(c) provides: "References in the Internal Revenue Code to Guam will be deemed also to refer to the Northern Mariana Islands, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof or of this Covenant." Covenant § 601(c).

**7.** "Section 606(b) clearly limits the social security taxes that may be applied to 'excise and self-employment taxes to support ... the United States Social Security System.'" Pls.' Br. filed Mar. 11, 2009, at 26.

Mar. 11, 2009, at 20. "All tax laws are thus 'otherwise provided in this Covenant' and excluded expressly from the scope of section 502, without more." *Id.* (*quoting* Covenant § 502(a)).

Citing the canon of statutory construction that specific statutes control over general statutes that address the same subject, plaintiffs relegate section 502(a)(2) to a mere "general rule of thumb that is qualified and restricted by specific Covenant provisions." Pls.' Br. filed Mar. 11, 2009, at 20–21. Any matter that falls within the scope of section 502(a)(2) is displaced by subsequently enacted legislation covering the same subject.[8]

■ Plaintiffs reason that application of section 601(c) is limited to income taxes by virtue of section 601's territorial income tax structure[9] and by operation of section 601(c)'s textual limitation to those Internal Revenue Code provisions that are not "otherwise distinctly expressed or manifestly incompatible with the intent thereof or of this Covenant." Covenant § 601(c). Because FICA taxes are payable to the U.S. Treasury, any FICA taxes collected under section 601(c) must be "covered over" to the CNMI under Covenant section 703(b).[10] Repayment of FICA taxes to the CNMI is itself an "absurd result" that is "manifestly incompatible" with the Covenant's intent.[11] Pls.' Br. filed Mar. 11, 2009, at 22.

Finally, plaintiffs argue that defendant's interpretation of "the United States" in

---

8. Plaintiffs cite the 1983 Act as legislation that "displaces for its entire subject" section 502(a)(2). Pls.' Br. filed Mar. 11, 2009, at 21.

9. Because sections 601(a) and (b) implement a local territorial income tax in the CNMI, plaintiffs deduce that "the United States has no income or other tax jurisdiction over foreign contract workers in the Commonwealth." Pls.' Br. filed Mar. 11, 2009, at 22. As support for their construction that section 601(c) is limited to income taxes, plaintiffs quote Rev. Rul. 80–167, 1980–1 C.B. 176, which itself quotes S.Rep. No. 94–433, at 79–80, as follows: " 'Under (section 601(c)) the *federal income tax laws will apply as a local territorial income* tax in the same manner as those laws are in force in Guam.' " Pls.' Br. filed Mar. 11, 2009, at 22. While plaintiffs' quotation of the Revenue Ruling is accurate, the Revenue Ruling itself oddly misquotes the Senate Report. The actual sentence states *"[u]nder subsection (a)* the federal income tax laws will apply as a local territorial income tax...." S.Rep. No. 94–433, at 79 (emphasis added).

10. Section 703(b) provides: "There will be paid into the Treasury of the Government of the Northern Mariana Islands, to be expended to the benefit of the people thereof as that Government may by law prescribe, the proceeds of all customs duties and federal income taxes derived from the Northern Mariana Islands...." Covenant § 703(b).

11. Plaintiffs also cite to the Act of March 12, 1980, Pub.L. No. 96–205, § 204(b), 94 Stat. 84, 87 (*codified as amended at* 48 U.S.C. § 1842 note (2006)) as evidence of Congress's intent that FICA taxes are not to be collected under Covenant section 601. *See* Transcript of Proceedings, *Zhang v. United States,* Nos. 08–269T & 08–270T, at 32–33 (Fed.Cl. July 17, 2009) ("Tr."). ("Moreover, if you look at what Congress did after the [Covenant] was written, when it was, in fact, implementing on a nuts-and-bolts, daily basis how it's going to incorporate the NMI, it passed 48 U.S.C. § 1842, which is a direct, specific instruction to cover over all taxes to the NMI legislature under 601. Now, that is both later in time, and, under Covenant section 105, effective to modify any contrary terms in the [C]ovenant."). Plaintiffs' reliance on 48 U.S.C. § 1842 is not persuasive.

48 U.S.C. § 1842 provides in full: "The Secretary shall take such steps as are necessary to ensure that the proceeds of taxes collected under the provisions of sections 601, 602, 603, and 604 of the Covenant (Public Law 94–241) are covered directly upon collection into the treasury of the [CNMI]."

As defendant notes, Def.'s Br. filed June 23, 2009, at 3, 4 n. 2, Covenant section 703(b), like § 1842, mandates that taxes collected by the United States in the CNMI are to be paid to the CNMI treasury. *See* Covenant § 703(b). However, unlike § 1842, section 703(b) specifically exempts FICA taxes from its general rule. *See* § 703(b) ("[N]othing in this Section shall be construed to apply to any tax imposed by Chapters 2 [SECA] or 21 [FICA] of Title 26, United States Code.").

Furthermore, construing § 1842 as the controlling statute violates the canon that " 'a specific statute controls over a general one without regard to priority of enactment.' " *Thiess v. Witt,* 100 F.3d 915, 919 (Fed.Cir.1996) (*quoting Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961)). Section 703(b) specifically exempts FICA taxes from the general rule, provided in both section 703(b) and § 1842, that all other taxes are to be paid into the treasury of the CNMI. Plaintiffs' construction of § 1842 also would result in impliedly revoking section 703(b) thereby violating the canon that repeals by implication are strongly disfavored. *Inter-Coastal Xpress, Inc. v. United States,* 296 F.3d 1357, 1369–70 (Fed.Cir.2002).

I.R.C. § 3121(e)(2) requires that FICA apply in a geographical sense to all persons in the CNMI. Plaintiffs submit that, among other laws passed after the Covenant was approved, section 19 of the 1983 Act demonstrates a congressional intent not to apply "the United States" in a geographical sense. Plaintiffs reason that Congress was required to amend I.R.C. § 3121(e) after the Covenant became effective in 1987 expressly to include the CNMI. Specifically, plaintiffs interpret section 105 of the Covenant to require Congress to amend I.R.C. § 3121(e) as a precondition for encompassing the CNMI. *See* Pls.' Br. filed Mar. 11, 2009, at 12 n. 18. Plaintiffs also note that Congress amended I.R.C. § 3121(e) numerous times to add *"every* other territory, possession or insular area," but not the CNMI. *Id.* at 11. According to plaintiffs, Congress amended a "host of internal revenue, social security, and other statutes" to add the CNMI even when those statutes already were applicable to Guam. *Id. (citing* I.R.C. §§ 881, 935, and 937). If the court were to accept defendant's interpretation that I.R.C. § 3121(e)(2) facially applies FICA to the CNMI, plaintiffs regard every congressional amendment to have been unnecessary. *Id.* at 11–12.

### 2) *Canons of statutory construction*

Because the Covenant has been codified as a statute, interpretation of the Covenant is guided by the canons of statutory construction. *See N. Mariana Islands v. United States,* 279 F.3d 1070, 1074 (9th Cir.2002) (holding that Quiet Title Act and Covenant section 502(a)(2) are "to be read as consistent" under statutory canon obligating courts "to construe federal statutes so that they are consistent with each other" (citation omitted)). Determining whether FICA applies to the CNMI through Guam requires three steps: first, determining whether FICA is encompassed by section 606 of the Covenant; second, whether section 606(b)'s reference to "[t]hose laws of the United States which impose excise taxes ... to support or which provide benefits from the United States Social Security System" comprehends I.R.C. § 3101, the FICA tax on employee wages; and third, whether any subsequent amendments to the Covenant have affected the applicability of FICA to the CNMI.

"In construing a statute, we begin with its literal text, giving it its plain meaning." *USA Choice Internet Servs., LLC v. United States,* 522 F.3d 1332, 1336 (Fed.Cir. 2008) (internal quotation omitted); *see also Kyocera Wireless Corp. v. Int'l. Trade Comm'n,* 545 F.3d 1340, 1355 (Fed.Cir.2008) ("In order to determine whether [a statute] or any of its amendments has directly spoken to the precise question at issue, [the] court must give the terms of that statute their 'ordinary ... meaning, absent an indication Congress intended them to bear some different import.'" (quoting *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000))). "Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history." *Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir.2007) (internal quotation omitted). "Further, 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Kyocera Wireless Corp.,* 545 F.3d at 1355 (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)). "Correct statutory interpretation is that which is 'most harmonious with [the statutory] scheme and with the general purposes that Congress manifested.'" *Black-Light Power, Inc. v. Rogan,* 295 F.3d 1269, 1273 (Fed.Cir.2002) (quoting *Comm'r v. Engle,* 464 U.S. 206, 217, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984)).

The court also is guided by the familiar canon of statutory construction that "'a specific statute controls over a general one without regard to priority of enactment.'" *Thiess,* 100 F.3d at 919 (quoting *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961)). Repeals by implication are strongly disfavored. *Cathedral Candle Co. v. U.S. Int'l. Trade Comm'n,* 400 F.3d 1352, 1365 (Fed. Cir.2005); *Inter–Coastal Xpress, Inc.,* 296 F.3d at 1369–70 (citing *Randall v. Loftsgaarden,* 478 U.S. 647, 661, 106 S.Ct. 3143, 92

L.Ed.2d 525 (1986) ("It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored.")); *Southwest Marine of S.F., Inc., v. United States*, 896 F.2d 532, 533 (Fed.Cir.1990) ("This is particularly true when, as here, we are urged to find that a specific statute ... has been superseded by a more general one."). "[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (internal quotation omitted). "Evidence of intention to repeal an earlier statute must be 'clear and manifest'; courts must read seemingly conflicting statutes 'to give effect to each if we can do so while preserving their sense and purpose.'" *Cathedral Candle Co.*, 400 F.3d at 1365 (*quoting Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)); *see also Inter–Coastal Xpress*, 296 F.3d at 1370 ("For a more recent statute to impliedly repeal an existing one, it is insufficient to demonstrate that the two statutes produce differing results when applied to the same factual situation.... The legislative intent to repeal must be manifest in the positive repugnancy between the provisions of the two statutes." (internal quotation omitted)).

■ Finally, the Federal Circuit has reminded the court that the canon "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer," *USA Choice Internet Servs.*, 522 F.3d at 1343 (internal quotation omitted), is inapplicable when such doubts "'which may arise upon a cursory examination of [the statutory provisions at issue] disappear when they are read, as they must be, with every other material part of the statute, and in the light of their legislative history,'" *id.* (*quoting White v. United States*, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172 (1938)) (*citing Irwin v. Gavit*, 268 U.S. 161, 168, 45 S.Ct. 475, 69 L.Ed. 897 (1925) (announcing caveat that "tax laws should be construed favorably for the taxpayers ... is not a reason for creating a doubt or for exaggerating one")).

3) *Application of FICA to the CNMI through Covenant section 606(b) because Guam is a part of the "United States" in I.R.C. § 3121(e)(2)*

The correct definition of "United States," as used in the Internal Revenue Code, appears in I.R.C. § 3121(e)(2). *Cf. Abrahamsen v. United States*, 228 F.3d 1360, 1364 (Fed.Cir.2000) (applying definition of "wages" in I.R.C. § 3121(a) to define term "wages" under FICA). I.R.C. § 3121(e)(2) facially and unambiguously includes Guam as part of the "United States" for purposes of the Internal Revenue Code when the term "United States" is used geographically. Whether the term "United States" is employed in a geographical sense for purposes of FICA bears directly on whether Guam is considered part of the "United States" for purposes of FICA.

■ The court concludes that the term "United States" is used in a geographical sense in FICA. FICA is intended to impose FICA taxes on employers and employees to generate financial support for vestigial workers who have since ceased working. *See Associated Elec. Coop., Inc. v. United States*, 226 F.3d 1322, 1326 (Fed.Cir. 2000). In effectuating the important breadth of coverage necessary for FICA taxation to meet its remedial purpose, courts often define words broadly for the purposes of FICA. *Id.; see also Ainsworth v. United States*, 185 Ct.Cl. 110, 399 F.2d 176, 185–86 (1968) (ordering amount of FICA taxes be paid into plaintiff's FICA account rather than deducting amount from plaintiff's judgment). To the extent debate exists about the use of the term "United States" in a geographical sense, if answering in the affirmative expands FICA coverage and encourages its remedial purpose, the answer is yes, and Guam is incorporated. Therefore, as mandated by Covenant section 606(b), the CNMI is demonstrably part of FICA through Guam. Plaintiffs' attack on the geographical-versus-non-geographical use of "United States" to reach the CNMI does not derogate from the chain of association between FICA and the CNMI.

Plaintiffs incorrectly construe Covenant section 105 as requiring Congress to amend

I.R.C. § 3121(e) specifically to include the CNMI. When Article VI is read in light of the Covenant's overall structure, it is manifest that FICA expressly applies to the CNMI through section 606. The tax and revenue provisions in Article VI are self-contained and not dependent on section 105 or any other provision of the Covenant. Moreover, the language of section 105— "[t]he United States *may* enact legislation ... which *will* be applicable to the Northern Mariana Islands"—is forward-looking. Covenant § 105 (emphasis added). The purpose of this provision is to allow Congress to enact laws after the Covenant became effective that would apply to the CNMI. Yet, at the time the Covenant became effective in 1987, I.R.C. § 3121(e)(2) already included Guam in its definition of the "United States." See Social Security Amendments of 1960 Act, Pub.L. No. 86–778, § 103(p), 74 Stat. 924, 939 (1960). Accordingly, no need was present for Congress to use Covenant section 105's legislative grant to apply FICA to the CNMI.

Because FICA applies to Guam through I.R.C. § 3121(e)(2) and section 606(b) of the Covenant applies FICA to the CNMI through Guam, plaintiffs' inquiry into whether Congress intended to apply FICA geographically to all persons in the CNMI, *See* Pls.' Br. filed Mar. 11, 2009, at 9, does not enlighten the resolution of the issue whether FICA applies to the CNMI, but rather bears upon who is subject to FICA taxation.

IV. *Applicability of the FICA employee wage tax to the CNMI*

1. *Application by Covenant sections 502(a)(2) or 601(c) of the FICA employee wage tax to the CNMI*

The court declines to adopt defendant's arguments that both sections 601(c) and 502(a)(2) apply FICA's employee tax. Assuming, *arguendo,* that section 606(b) only applies the employer FICA excise and SECA taxes, its legislative history notwithstanding, this construction comports with the well-settled principle that the court "must presume that [Congress] says in a statute what it means and means in a statute what it says there." *Dodd v. United States,* 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005)

(internal quotation omitted). Therefore, for the employee FICA tax to apply to the CNMI through either sections 601(c) or 502(a)(2), it must do so in a manner that does not conflict with the other provisions of the Covenant, including section 606(b). *See BlackLight Power,* 295 F.3d at 1273 ("Correct statutory interpretation is that which is most harmonious with [the statutory] scheme ...." (internal quotation omitted)).

Section 601(c) provides: "References in the [I.R.C.] to Guam will be deemed also to refer to the [CNMI], where not otherwise distinctly expressed [i.e., where an I.R.C. provision applicable to Guam is not to apply to the CNMI] or manifestly incompatible with the intent thereof or of this Covenant." Covenant § 601(c). If, as defendant suggests, section 601(c) applies the entire Internal Revenue Code, including FICA, to the CNMI, section 601(c) would render section 606(b) superfluous. Under such a construction, Congress would not apply specifically the FICA employer and SECA taxes to the CNMI "as they apply to Guam" in section 606(b) because they would already apply through section 601(c). Defendant's construction thus would violate the canons obliging courts to give meaning to every word in a statute and to be "'reluctant to treat statutory terms as surplusage in any setting.'" *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.,* 543 F.3d 657, 662 (Fed.Cir.2008) (*quoting Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).

This court agrees with plaintiffs that section 601(c), properly construed, is limited to the Internal Revenue Code's income tax provisions. Section 601(c)'s legislative history supports this construction. Defendant contends that the 1975 Senate report accompanying the Covenant "confirms that § 601(c) applies the entire [I.R.C.] to the CNMI." Def.'s Br. filed June 23, 2009, at 3–4 n. 2 (noting the report's reference to excise tax exemption granted to Guam that would apply to CNMI (*citing* S.Rep. No. 94–433, at 80)). However, defendant neglected to include the preamble to the report's analysis of section 601 in the appendix to its brief, which states *"Section 601.—*This section deals with

the application of the federal income tax laws." S.Rep. No. 94–433, at 79. While the report's analysis of section 601(c) does refer to an excise tax exemption, it does so only in the context of explaining that section 601(c)'s purpose is to make Internal Revenue Code "benefits" that apply to Guam also apply to the CNMI. *See id.* at 80. The territorial excise tax exemption cited by the report, I.R.C. § 7653(b), is merely an example of a tax benefit available to Guam. Neither the text nor legislative history of section 601(c) speaks to applying to the CNMI tax burdens unrelated to federal income tax.

The court also agrees with plaintiffs' argument that FICA taxes cannot be imposed on the CNMI by operation of Covenant section 502(a)(2), given that its terms conflict with those of section 606(b). Section 502(a) provides: "The following laws of the United States . . . will apply to the [CNMI], except as otherwise provided in this Covenant: . . . (2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several states. . . ." Covenant § 502(a). Defendant argues that section 502(a)(2) serves as a general gap-filler for the Covenant. *See* Def.'s Br. filed June 23, 2009, at 3 n. 2 (explaining that if section 606(b) did not apply the employee FICA taxes to the CNMI, then section "502 would apply it"). Defendant's logic is that 502(a)(2) applies FICA to the CNMI because FICA applies to Guam and is a law of general application to the states. Yet, the language of section 502(a)(2) itself forecloses this construction. Section 502(a)(2) operates to apply federal laws "as they are applicable to the several states," not as they apply to Guam. By contrast, section 606(b) applies the federal FICA and SECA taxes "as they apply Guam," not to the states. This distinction suggests that FICA and SECA taxes apply to taxpayers in Guam differently than to taxpayers in the states. Therefore, applying FICA to the CNMI through section 502(a)(2) nullifies section 606(b)'s clause "as they apply to Guam." "[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus,* 467

U.S. at 1018, 104 S.Ct. 2862 (internal quotation omitted). Consequently, neither section 502(a)(2) nor section 601(c) applies FICA to the CNMI. This conclusion, however, does not alter the court's final determination that the employee FICA tax applies to the CNMI by operation of section 606(b).

### 2. *Covenant section 606(b) as encompassing the FICA tax on employee wages*

■ Plaintiffs' argument that the Covenant does not apply the employee FICA tax to nonresident alien employees working in the CNMI ultimately cannot prevail. Defendant correctly observes that, strictly construed, Covenant section 606(b) would apply Social Security benefits to employees earning wages in the CNMI, but would not impose the corresponding requirement that they pay their share of the FICA tax burden. As defendant aptly expresses, the result is that employees working in the CNMI would be "getting something for nothing. Nobody else who is covered by FICA gets something for nothing like that." Transcript of Proceedings, *Zhang v. United States,* Nos. 08–269T & 08–270T, 2009 WL 3088790, *6 (Fed.Cl. July 17, 2009) ("Tr."). It is this court's judgment that literally construing section 606(b) to render FICA taxation inapplicable by omitting it from the applicable taxes produces an absurd result.

■ A fundamental canon of statutory construction is the admonition that "an interpretation that causes absurd results is to be avoided if at all possible." *Pitsker v. Office of Pers. Mgmt.,* 234 F.3d 1378, 1383 (Fed.Cir. 2000). The court thus turns to the Covenant's legislative history in order to resolve this "very peculiar result." Tr. at 9. The court is mindful that avoiding a bizarre or absurd result from a literal construction of a statute "does not justify a reading unsupported by the text, unless it can be shown that the intent of Congress was imperfectly expressed, a showing that can be made from legislative history or from the structure of the statutes taken as a whole. Anything more is setting up the judge as wiser than the legislator." *Denkler v. United States,* 782 F.2d 1003, 1007–08 (Fed.Cir.1986) (citation omitted); accord *Dodd,* 545 U.S. at 359,

125 S.Ct. 2478 ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation omitted)).

The relevant legislative history discloses Congress's intent that all three FICA provisions apply to section 606(b). Both the House and Senate reports accompanying the Covenant state: "Subsection (b) [of Covenant section 606] assures that the laws of the United States which impose taxes to support . . . the United States Social Security System will become applicable to the Northern Marianas as they are applicable to Guam upon termination of the Trusteeship Agreement. . . ." H.R.Rep. No. 94–364, at 11; *accord* S.Rep. No. 94–433, at 83. Even more illuminating is the Section–by–Section Analysis issued by the Northern Marianas Political Status Commission, which was considered by Congress prior to its approval of the Covenant. *See* S.Rep. No. 94–433, at 65–94.

The Ninth Circuit, whose construction of the Covenant the court deems persuasive, looks to the Section–by–Section Analysis when interpreting the Covenant. *See N. Mariana Islands v. United States,* 399 F.3d 1057, 1065 (9th Cir.2005) ("We have relied in previous opinions on the Marianas Political Status Commission's authoritative Section–by–Section Analysis of the Covenant to assist us in discerning the meaning of the Covenant." (citations omitted)). The Commission's analysis describes section 606(b), as follows:

> Subsection (b) [of section 606] assures that the laws of the United States which impose taxes to support or which provide benefits from the United States Social Security System will become applicable to the Northern Marianas as they are applicable to Guam upon termination of the Trusteeship Agreement. . . . At this time as well, those laws of the United States which impose taxes to support the United States Social Security System will become applicable. The reason that the Covenant is structured in a way which does not make the United States social security laws applicable immediately is that the taxes which are imposed to support the social security system are very burdensome as compared to the taxes which are paid by the people of the Northern Marianas today. . . . [T]hese laws will become effective in the Northern Marianas no later than termination of the Trusteeship, at which time the entire Covenant will be effective.

Section–by–Section Analysis, *supra,* at 80–81.[12]

---

**12.** *See also* Second Interim Report, *supra,* at 415 ("Employers and employees in the Northern Mariana Islands are made subject to taxes imposed by the Federal Insurance Contributions Act to support the federal social security system at the time the social security systems of the Northern Mariana Islands and the United States are merged. . . .").

Plaintiffs repeatedly emphasize that the Second Interim Report acknowledges the Covenant's omission of the FICA employee tax. *See* Pls.' Br. filed Mar. 11, 2009, at 27 n. 33 (*citing* Second Interim Report, *supra,* at 465–66). At oral argument, plaintiffs' counsel stated:

The government now wants to pull a comment out of the second interim report and rely on that to ask you to rewrite 606(b) to include an employee FICA tax that is not there, and you can just as easily look at that second interim report, for which we have no evidence of any consideration by Congress, and not related to any legislation, you can look at that interim report, and we cite it at page 27, Note 33, of our opposition, to see that they specifically pointed out, oh, and there is no FICA employee tax imposed anywhere in the covenant, and

nobody blinked twice. Nobody changed anything.

Tr. at 54. The court has examined thoroughly the provision of the Second Interim Report to which plaintiffs refer. Among other factual errors made by plaintiffs, nowhere in the cited pages or in any other part of the report does the Commission acknowledge, imply, suggest or hint that the Covenant does not impose the FICA tax on employee wages.

This section of the Second Interim Report does discuss the application of Internal Revenue Code employment tax provisions to the CNMI, including a detailed analysis of the FICA "wage-based taxes on employers and employees to support . . . social security." Second Interim Report, *supra,* at 465. Under the heading "Present applicability," the report quotes word-for-word Covenant section 606(b), then explains:

At the time *these taxes* become effective, the social security system of the Northern Mariana Islands is merged into the federal system, and persons in the Northern Mariana Islands become eligible for federal social security benefits *based on their contributions* into either the Northern Mariana Islands or the federal system.

The only rational conclusion that can be drawn from the legislative history is that the drafters of the Covenant, the Commission, and Congress all intended that section 606(b)'s reference to "excise taxes ... to support" referred to FICA, including the employer and employee wage tax provisions in I.R.C. §§ 3101 and 3111.

These legislative documents are uniform in their treatment of section 606(b), unambiguously demonstrating that all FICA tax provisions were intended to apply to the CNMI. This is the most sensible construction, as it explains why the Covenant does not state that all CNMI employees are exempted from the FICA tax, as plaintiffs argue. Accordingly, the court holds that the FICA tax on employee wages applies to employees working in the CNMI by operation of section 606(b) of the Covenant.

Guam is part of the "United States" under FICA. The CNMI, through section 606(b) of the Covenant, is subject to FICA taxation through its statutory linkage to Guam. The last inquiry into the extent of FICA taxation, particularly whether nonresident alien workers and their employers are subject to FICA taxation, depends upon whether, subsequent to the ratification of the Covenant, Congress acted to limit FICA taxes in the CNMI.

## V. *The resolution of whither FICA?*

Plaintiffs argue that prior to the effective date of section 606(b) of the Covenant, Congress enacted legislation severely curtailing the application of Social Security programs and FICA taxes through the Covenant. Plaintiffs cite to 42 U.S.C. § 1301 (2006), and the 1983 Act to support their theory that Congress did not intend all Social Security benefits programs or their supporting taxes to apply to the CNMI as they apply to Guam. For the following reasons, these arguments are unavailing. Each provision is discussed in turn.

### 1. *42 U.S.C. § 1301*

Plaintiffs proffer that Congress displaced Covenant section 606(b)'s application of So-

cial Security benefits to the CNMI as they applied to Guam when it enacted 42 U.S.C. § 1301. *See* Tr. at 28 ("In 1981, they amended 42 U.S.C. § 1301, and if you go through 42 U.S.C. § 1301, you will see that Congress walked totally away from the language of 606(b)...."). Plaintiffs claim that § 1301 shows Congress's desire "to specify Article by Article those provisions of the Social Security Act for which the Commonwealth will be considered one of 'the United States.' Congress chose not to include the Commonwealth 'in the United States' for those Articles and statutes that determine a geographical application of FICA taxes." Pls.' Br. filed Mar. 11, 2009, at 21 (*citing* I.R.C. § 3121 and 42 U.S.C. § 410(i)). This is nonsense. For the reasons already set forth, the court concludes that FICA does apply to the CNMI—in a geographic sense—and so the CNMI is a "part of the United States" for FICA purposes.

More importantly, the construction of 42 U.S.C. § 1301 urged by plaintiffs effectively repeals much of Covenant section 606(b). The text of § 1301 does not state expressly that it operates to amend any part of section 606(b). Thus, for plaintiffs' construction to prevail, the court would have to conclude that § 1301 repeals section 606(b) by implication. This contravenes the venerable canon that repeals by implication are strongly disfavored. *See Cathedral Candle Co.*, 400 F.3d at 1365; *Inter–Coastal Xpress*, 296 F.3d at 1369–70 (*citing Randall*, 478 U.S. at 661, 106 S.Ct. 3143). "[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Ruckelshaus*, 467 U.S. at 1018, 104 S.Ct. 2862. "Evidence of intention to repeal [an] earlier statute must be 'clear and manifest'; courts must read seemingly conflicting statutes 'to give effect to each if we can do so while preserving their sense and purpose.'" *Cathedral Candle Co.*, 400 F.3d at 1365 (*quoting Watt*, 451 U.S. at 267, 101 S.Ct. 1673).

The court also notes that 42 U.S.C. § 1301 is the general definitions provision of the

---

*Id.* at 466 (emphasis added). One does not speculate to conclude that the Commission viewed

section 606(b) as encompassing the FICA tax on employee wages.

Social Security Act. It is correct that § 1301(a)(1) defines the term "State" differently for Guam than for the CNMI in several provisions of the Social Security Act, including Title II. However, each instance involves the application of a Social Security benefits program, and none refers to or involves FICA.[13] Therefore, Congress's amendments to § 1301 are not relevant to the issue of whether Congress changed FICA's application to the CNMI through the Covenant.

## 2. *Section 19 of the 1983 Act*

Plaintiffs argue that Congress substantially amended and implemented Covenant section 606(b) and limited the applicability of FICA taxes to the CNMI when it enacted section 19(b) of the 1983 Act.[14][15] According to plaintiffs, section 19(b) continues to control Covenant section 606(b) by operation of the merger clause in section 25 of the 1983 Act.[16] Plaintiffs are adamant that any analysis of the Covenant must take into account how the changes made by the 1983 Act apply to the

CNMI under the Covenant. They argue that section 19(b) reveals a congressional intent that "neither the benefits nor the burdens of federal social security benefits programs shall apply to aliens in the [CNMI]. Congress rejected a geographical application of the social security laws to the [CNMI] [i.e., Covenant Article VI], in favor of a limitation to [CNMI] citizenship or nationality." Pls.' Br. filed Mar. 11, 2009, at 16. In other words, FICA taxes and their corresponding Social Security benefits only apply to U.S. and CNMI citizens; all other aliens specifically are excluded from the burdens and benefits of Title II.

From this premise plaintiffs deduce that because plaintiff employees are temporary contract workers and/or are neither citizens of the United States nor citizens of the CNMI, the burdens of Federal Social Security benefits programs, i.e., FICA taxes, are not applicable to them. Plaintiffs urge a construction of section 19(b) as operating independently of section 19(a).

---

**13.** For example, 42 U.S.C. § 1301 first lists the CNMI in reference to subchapter V, which provides for block grants to maternal and child health services. *Compare* 42 U.S.C. § 1301(a)(1) *with* 48 U.S.C. §§ 701–10. Plaintiffs' argument to the contrary is simply a strawman.

**14.** Section 19(b) provides: "A statute which denies a benefit or imposes a burden or a disability on an alien, his dependents, or his survivors shall, for the purposes of this Act, be considered to impose a requirement of United States citizenship or nationality." § 19(b), 97 Stat. at 1464.

**15.** The provisions of the 1983 Act relating to the NMI were enacted pursuant to Congress's unilateral authority to amend certain provisions of the Covenant under section 105, which provides:

The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

Covenant § 105. Plaintiffs argue that the importance of section 105 cannot be overstated. At oral argument, plaintiffs' counsel described section 105, as follows:

So when Congress legislates for the Northern Mariana Islands ... that congressional legislation is effective and amends or supersedes the provisions of the covenant wherever it is more specific or in conflict with any of those terms.... It's really important here because you've got to recognize, and it's documented in the legislative history that you have, that the language of the covenant was written in 1975. It is a lot of platitudes, it is a lot of very general concepts and ideas, and there is a clear recognition, in both the House and Senate reports, that we are going to get more specific as we go along, and we are going to figure out how we incorporate this series of islands....
Tr. at 25–26.

**16.** Section 25 provides:

Upon the establishment of the Commonwealth of the Northern Mariana Islands pursuant to section 1002 of the Covenant, the benefits acquired under this Act shall merge without interruption into those to which the recipient is entitled by virtue of his acquisition of United States citizenship, unless the recipient exercises his privilege under section 302 of the Covenant to become a national but not a citizen of the United States.
§ 25, 97 Stat. at 1466; *see also* Tr. at 37 (plaintiffs' counsel explaining that section 25 says "nothing about [the 1983 Act] expiring or having no future effect").

Plaintiffs assert that the legislative history of the 1983 Act demonstrates that Congress was responding to three issues: (1) the impact of U.S. tax laws on the CNMI economy; (2) implementation of the recommendations of the First Interim Report; and (3) concerns raised by the Department of Justice involving the Ninth Circuit's decision in *Pangilinan v. Castro*, 688 F.2d 610, 614 (9th Cir.1982) (holding that new government of CNMI could not deny certificates of identity as citizens of CNMI to individuals who renounced Filipino citizenship in order to become citizens of CNMI and were eligible to vote in first elections in CNMI).[17]

Defendant demurs that section 19(b) of the 1983 Act must be read in light of section 19(a), which grants the President authority to declare the requirement of U.S. citizenship in various statutes inapplicable to CNMI citizens. Defendant construes subsection b as defining the statutes listed in subsection a that impose a requirement of U.S. citizenship as "statutes that deny a benefit or impose a burden or disability on an alien." Def.'s Br. filed June 23, 2009, at 17. The "aliens" referenced in subsection b were not "aliens" in general, but were those CNMI citizens who were not citizens of the United States until the Covenant went into effect. Defendant characterizes plaintiffs' construction of

section 19(b) as a "gaping *non sequitur*," concluding:

> Citing an Act intended only to grant some listed privileges to CNMI citizens before they would otherwise have them, the plaintiffs have exempted all the aliens in the CNMI from all the FICA taxes and from all the possible burdens of several hundred other U.S. laws, the effects of which the plaintiffs do not consider.

Def.'s Br. filed June 23, 2009, at 17. The court agrees with this assessment. For the following reasons, the court concludes that plaintiffs' construction of the 1983 Act is incorrect and declines to adopt it.

1) *History of the 1983 Act*

The drafters of the Covenant anticipated conflicts arising when laws of the United States were applied to the CNMI. To address this issue, section 504 of the Covenant prescribed the Commission to address the particular interests of the CNMI. Section 504 provides:

> The President will appoint a Commission on Federal Laws to survey the laws of the United States and to make recommendations to the United States Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner.... The Com-

---

17. Citing the October 6, 1983 testimony of Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, before the Senate Subcommittee on Energy Conservation and Supply of the Committee on Energy and Natural Resources, plaintiffs state that the Department of Justice was of the view that the Ninth Circuit's decision in *Pangilinan*

> improperly expanded beyond the terms of the Covenant the class of persons who could claim the benefits of [CNMI] citizenship and thereby participate in federal benefits programs. The Department of Justice proposed legislation that would accelerate application of social security benefits to the citizens of the [CNMI], while excluding those not entitled to citizenship.... Congress responded by enacting [the 1983 Act].

Pls.' Br. filed Mar. 11, 2009, at 15 (citing Hearings on S. 1366 and S. 1367 Before the S. Comm. on Energy and Natural Resources Subcomm. on Energy Conservation and Supply, 98th Cong. 89 (1983) [hereinafter "Hearings"] (Statement of Robert B. Shanks, Deputy Assistant Att'y Gen., Office of Legal Counsel) (footnote omit-

ted)). The testimony of Deputy Assistant Attorney General Shanks concerning *Pangilinan* involved the "definition of citizens of the Northern Marianas in section 7(b)" of the Justice Department's proposed draft of a prior version of the 1983 Act. Hearings, supra, at 89. That provision corresponded to section 110 of the proposed bill, see id., what eventually became section 24(b) of the 1983 Act, which defines "Citizen of the Northern Mariana Islands." § 24, 97 Stat. at 1465. Indeed, as the testimony of Deputy Assistant Attorney General Shanks clarifies, Pangilinan concerned the rights of persons who were granted CNMI citizenship, but who were not going to become United States citizens under Covenant section 301. Id.; see also *Pangilinan*, 688 F.2d at 614. The case had nothing to do with excluding aliens from FICA taxes under section 19(b) of the 1983 Act, a provision that Deputy Assistant Attorney General Shanks specifically discussed earlier in his testimony. Compare Hearings, supra, at 95 (discussing proposed language for section 19(b)), with id. at 97–98 (discussing proposed language for section 24(b) and Pangilinan).

mission will make its final report and recommendations to the Congress within one year after the termination of the Trusteeship Agreement, and before that time will make such interim reports and recommendations to the Congress as it considers appropriate to facilitate the transition of the Northern Mariana Islands to its new political status. In formulating its recommendations the Commission will take into consideration the potential effect of each law on local conditions within the Northern Mariana Islands, the policies embodied in the law and the provisions and purposes of this Covenant.

Covenant § 504. Pursuant to that section's mandate, the Commission was established, which issued the First Interim Report to Congress in January 1982. The First Interim Report recommends, *inter alia,* that Congress enact legislation "to extend certain statutory rights and privileges of U.S. citizenship to the citizens of the Northern Mariana Islands prior to their becoming citizens of the United States." First Interim Report, *supra,* at 4. The report explains, in relevant part:

> *In general.* Many federal laws require United States citizenship as a prerequisite to enjoyment of rights and privileges conferred by those laws. Citizens of the Northern Mariana Islands are not now citizens of the United States.
>
> On full implementation of the Covenant, however, they will become citizens of the United States. At that time they will no longer be denied these rights and privileges on citizenship grounds.

> . . . .
>
> ... During the possibly-lengthy period between now and the end of the trusteeship, no sound reason for denying citizens of the Northern Mariana Islands access to the rights and privileges provided by these statutes is apparent. Removal of these citizenship barriers should ease the integration of the Northern Mariana Islands into the American political family.

*Id.* at 4–6. The report proposed legislation that would treat citizens of the CNMI as U.S. citizens for certain listed statutes that were already applicable to the citizens of the CNMI. *Id.* at 63–75. Among the statutes listed is 42 U.S.C. § 402(t) of the Social Security Act. *Id.* at 73. Section 402(t) proscribes the payment of OASDI benefits to nonresident aliens unless their country of citizenship has no generally applicable social security system, or it has a generally applicable social insurance system that pays benefits to U.S. citizens who have earned them. *See* 42 U.S.C. § 402(t).[18]

Congress subsequently adopted, with minor changes, the Commission's proposed legislation in section 19 of the 1983 Act. Section 19 reads:

> (a) The President may, subject to the provisions of section 20 of this Act, by proclamation provide that the requirement of United States citizenship or nationality provided for in any of the statutes listed on pages 63–74 of the Interim Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States, dated January 1982 and submitted pursuant to section 504 of the

---

18. Section 402(t) provides, in pertinent part:

 Suspension of benefits of aliens who are outside United States; residency requirements for dependents and survivors

 (1) Notwithstanding any other provision of this subchapter, no monthly benefits shall be paid under this section or under section 423 of this title to any individual who is not a citizen or national of the United States....

 . . . .

 (2) Subject to paragraph (11), paragraph (1) shall not apply to any individual who is a citizen of a foreign country which the Commissioner of Social Security finds has in effect a social insurance or pension system which is of general application in such country and under which—

 (A) periodic benefits, or the actuarial equivalent thereof, are paid on account of old age, retirement, or death, and

 (B) individuals who are citizens of the United States but not citizens of such foreign country and who qualify for such benefits are permitted to receive such benefits or the actuarial equivalent thereof while outside such foreign country without regard to the duration of the absence.

 (3) Paragraph (1) of this subsection shall not apply in any case where its application would be contrary to any treaty obligation of the United States in effect on August 1, 1956.

 42 U.S.C. § 402(t).

Covenant, // 48 USC 1681. // shall not be applicable to the citizens of the Northern Mariana Islands. The President is authorized to correct clerical errors in the list, and to add to it provisions, where it appears from the context that they were inadvertently omitted from the list.

(b) A statute which denies a benefit or imposes a burden or a disability on an alien, his dependents, or his survivors shall, for the purposes of this Act, be considered to impose a requirement of United States citizenship or nationality.

§ 19, 97 Stat. at 1464.

2) *Analysis of the 1983 Act's application to the Covenant*

 The court begins its analysis of the 1983 Act by examining the literal text of the statute, giving the words their plain meaning. *USA Choice Internet Servs.*, 522 F.3d at 1336. In so doing, the court cannot focus on a phrase in isolation. The court must "follow the cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it." *Hawkins v. United States*, 469 F.3d 993, 1000–01 (Fed.Cir.2006) (internal quotation omitted) ("Congress defined 'law enforcement officer' in [42 U.S.C.] § 3796b(5) (Supp. II 1984) as 'an individual involved in crime and juvenile delinquency control or reduction, or enforcement of the laws, including, but not limited to, police, corrections, probation, parole, and judicial officers.' Given the absence of the modifier 'criminal' before 'laws' in the statutory phrase 'enforcement of the laws,' the [trial court] read the phrase literally to mean *all* categories of

law.... This approach is incorrect, however, since courts cannot focus on the phrase 'enforcement of the laws' in isolation."). The court must " 'give effect, if possible, to every clause and word of [the] statute.' " *Kyocera Wireless Corp.*, 545 F.3d at 1355 (*quoting United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)).

 Reading the statute as a whole, the court gleans that the purpose behind section 19 of the 1983 Act was to give to the citizens of the CNMI the same statutory benefits that they would enjoy upon automatically attaining U.S. citizenship at the termination of the Trusteeship Agreement, but were being denied to them under current U.S. law. Consistent with this purpose, it is apparent that "aliens" as used in section 19(b) did not refer to non-U.S. or CNMI citizens. Rather, viewed in light of section 19(a) and its purpose, "aliens" refers precisely to CNMI citizens and residents who were not yet U.S. citizens and were treated as "aliens" under the pertinent provisions of the U.S.Code cited in subsection (a).[19] The 1983 Act has nothing to do with the applicability of Social Security laws to non-resident aliens in general, nor can plaintiffs extract from its legislative history the slightest evidence that Congress was concerned with the plight of foreign temporary contract workers in the CNMI. No provision of the 1983 Act relieves anyone from the burdens of paying FICA taxes or any other law. Rather, as both the relevant sections of the 1983 Act and its history demonstrate, its focus was exclusively on statutory benefits, not burdens.

**19.** Section 20 of the 1983 Act underscores the Act's overall beneficial purpose, and section 19 in particular. Section 20(a) grants the President of the United States authority to issue the proclamations called for under the Act, while section 20(b) provides the President standards for the exercise of his authority. Section 20(b) provides:

When issuing such proclamation or proclamations the President—, (1) shall take into account: (i) The hardship suffered by the citizens of the Northern Mariana Islands resulting from the fact that, while they are subject to most of the laws of the United States, they are denied the benefit of those laws which contain a requirement of United States citizenship or nationality; ...

§ 20(b), 97 Stat. at 1464. The standards provided to the President sought to clarify concerns raised by the Executive Branch over language contained in prior versions of the 1983 Act that extended statutory rights and benefits based on U.S. citizenship to the citizens of the CNMI prior to the termination of the Trusteeship Agreement. *See* Hearings, supra, at 93–94 (Statement of Robert B. Shanks, Deputy Assistant Att'y Gen., Office of Legal Counsel) ("Last year the Department of State and the Department of Justice opposed [the proposed legislation] ... [because] .... the provisions 'deeming' the citizens of the [CNMI] to be citizens of the [U.S.] might be considered to amount to surreptitious annexation of the [CNMI], which could hurt the United States in the international forum.").

Plaintiffs state that section 19(a) lists the "social security laws of the United States to be applied to the [CNMI] . . . ." Pls.' Br. filed Mar. 11, 2009, at 27. This characterization misreads the statute. All of the statutes incorporated by reference in section 19(a) already "applied" to the CNMI. Section 19(a)'s scope is limited to rendering the phrase "the requirement of United States citizenship or nationality" in those statutes inapplicable to citizens of the CNMI. Moreover, the only provision relating to Social Security in section 19(a) is 42 U.S.C. § 402(t). Under plaintiffs' construction, no other Social Security law, other than this one provision, would apply to the CNMI. The fact that 42 U.S.C. § 402(t) is the only provision relating to Social Security incorporated along with hundreds of other specific statutes, found in twenty-eight separate titles of the United States Code—none of which references or involves FICA taxes—is sufficient to show that Congress did not intend section 19 to modify or amend Covenant section 606(b).

Following the overall purpose of section 19, its language also shows the phrase "imposes a burden or a disability on an alien" in

section 19(b) cannot be construed in isolation. *See Hawkins,* 469 F.3d at 1001 ("Statutory language must be read in context since a phrase gathers meaning from the words around it." (internal quotation omitted)). Section 19(b) provides, in relevant part: "A statute which denies a benefit or imposes a burden or a disability on an alien, his dependents, or his survivors shall, *for the purposes of this Act* . . . ." § 19(b), 97 Stat. at 1464 (emphasis added). Congress's reference to "burdens" or "disabilities" imposed by a "statute" encompasses the specific statutes listed in section 19(a). It follows that "aliens" cannot mean anyone other than the "citizens of the Northern Mariana Islands" in section 19(a). Similarly, because FICA taxes are not included in section 19(a)'s enumerated statutes, section 19(b)'s reference to "burdens" does not apply to the payment of FICA taxes.[20]

The court rules that Congress did not act to limit FICA taxes in the CNMI when it passed the 1983 Act.[21] Consequently, any inquiry into the extent of FICA's application to taxpayers in the CNMI must be carried out through the rubric of Covenant section 606(b).[22]

---

20. Plaintiffs state that they are not subject to any FICA taxes because the wage taxes paid by employees and employers under FICA constitute a "burden" under section 19(b) of the 1983 Act. *See* Pls.' Br. filed Mar. 11, 2009, at 28 ("A tax payable by an employer by reason of employment of a nonimmigrant alien is a burden on both the employee/alien and the employer, because it lowers the value of the alien's labor."). However, assuming *arguendo* that the statutes referenced in section 19(b) exclude "nonimmigrant aliens" from the scope of section 19(a), as plaintiffs urge, plaintiffs still are not entitled to a refund of FICA taxes. As discussed above, section 19(b) does not apply to the payment of FICA taxes because FICA is not referenced in section 19(a), or in any other part of the 1983 Act, for that matter. Accordingly, plaintiffs' payment of FICA taxes constitutes neither a "burden" nor a "disability" under section 19(b). An inescapable consequence of this construction is, as defendant correctly notes, that the 1983 Act "has nothing to do with this case." Def.'s Br. filed June 23, 2009, at 18 n. 15. This rational, internally consistent construction overcomes plaintiffs' argument.

21. Section 9 of the 1983 Act does show that Congress examined and changed the text of Covenant section 606(b). *See* § 9, 97 Stat. at 1461 ("Subsection (b) of section 606 of the Covenant to Establish a Commonwealth of the Northern

Mariana Islands in Political Union With the United States of America, approved by Public Law 94–241, // 48 U.S.C. 1681.// is amended by striking out 'upon termination of the Trusteeship Agreement or' and inserting in lieu thereof 'on January 1 of the first calendar year following the termination of the Trusteeship Agreement or upon'."). The fact that Congress specifically amended section 606(b), but left alone its language regarding FICA, supports plaintiffs' argument that the omission of the employee FICA tax was deliberate because Congress had an opportunity to change subsection b and elected not to do so. However, a careful reading of this amendment discloses that it operates only to change subsection b's effective date to January 1. This prevented the confusion which likely would result if subsection b went into effect in the middle of a tax year. The amendment does not change the court's conclusion that omitting the employee FICA tax produces an absurd result, and that the Covenant's legislative history establishes Congress's intent that section 606(b) includes the employee FICA tax.

22. Plaintiffs cite to numerous other statutes and legislative provisions by which Congress has amended Social Security benefits programs, sometimes distinguishing their applicability to the CNMI from Guam. Yet, no amendment dis-

It is undisputed that, absent congressional amendment, section 606(b) imposes FICA taxes on employers in the CNMI and SECA taxes in the CNMI. Section 606(b) went into effect on January 1, 1987. Plaintiff Hyunjin employed workers such as the individual plaintiffs in the CNMI during all, or parts, of 2001 through 2007, well within the relevant time period for section 606(b) purposes. Therefore, because FICA's application to the CNMI through section 606(b) has not been amended or changed by Congress, the court concludes that plaintiff Hyunjin's claim for reimbursement of FICA cannot be granted. For the same reasons, and because the court has concluded that section 606(b) applies the employee FICA tax to the CNMI, the court also concludes that the individual plaintiffs' claims for reimbursement of FICA taxes cannot succeed.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for judgment on the pleadings is granted. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

closes any congressional intent to limit FICA's application to the CNMI or to distinguish the

CNMI from Guam for FICA purposes.